UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------X

CHARLES W. KERN,                          :

             Plaintiff,        :

                          :        3:03 CV 0233 (AVC)

    -against-                             :

ENVIRONMENTAL DATA                        :
RESOURCES, INC.                           :

           Defendant.        :        December 1, 2003

-------------------------------------------------------X

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO ALL OF PLAINTIFF'S CLAIMS AND AS TO LIABILITY ON DEFENDANT'S COUNTERCLAIMS

Pursuant to FED. R. CIV. P. 56, and the Local Civil Rules of the United States District Court for the District of Connecticut, Defendant Environmental Data Resources, Incorporated ("EDR"), respectfully submits this Memorandum of Law in support of its Motion for Summary Judgment as to all of Plaintiff's claims and as to liability on its counterclaims.

### PRELIMINARY STATEMENT AND PROCEDURAL HISTORY

Plaintiff Charles Kern ("Kern" or "Plaintiff") is a former employee of EDR. During his employment with EDR, Kern was privileged to receive confidential and proprietary information concerning EDR's products, customer lists, and pricing. Accordingly, during his employment, Kern signed two separate Confidentiality and Non-Competition Agreements.

On July 11, 2002, EDR terminated Kern's employment because it discovered he had engaged in a wide-ranging practice of expense reimbursement fraud. Specifically, after conducting an audit of Kern's expense reimbursement reports, EDR determined that Kern had regularly submitted duplicative and/or non-business related expenses for reimbursement. Kern admits that he was told he was being terminated because of his accounting errors.

1-MI/507141.3

On November 25, 2002, before Kern filed any charge with any government agency or court, and because EDR had learned that Kern might be acting in violation of his two non-competition agreements, EDR sent Kern a letter reminding him of his contractual, legal and ethical obligations to EDR and cautioning that any breach of these obligations would result in EDR pursuing all legal and equitable remedies available under law. That same day, EDR sent Environmental First Search Technology ("First Search"), its direct competitor and the company EDR understood Kern to be working for, a letter apprising First Search of Kern's continuing contractual, legal and ethical obligations to EDR.

On February 5, 2003, Kern filed this action alleging four causes of action arising from his termination from EDR. See Dkt. No. 1. Subsequently, on October 17, 2003, Kern amended his complaint to assert two additional causes of action for age discrimination and retaliation. See Dkt. No. 17. Kern has alleged: (i) that EDR failed to pay him wages in breach of his contract and in violation of the Connecticut Wage Payment Statute (Count I, IV); (ii) that EDR's conduct after his termination interfered with his business opportunities (Count II); (iii) that EDR's non-competition agreements are void and unreasonable (Count III); (iv) that EDR's decision to terminate his employment violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (Count V); and (v) that EDR retaliated against him by filing counterclaims against him in this action (Count VI).

EDR has answered Kern's Complaint and Amended Complaint. See Dkt. Nos. 9 and 18. Additionally, on March 28, 2003, EDR asserted six counterclaims against Kern arising from his fraudulent submission of expenses for reimbursement and his post-employment conduct in contravention of his non-compete agreements. EDR has conducted discovery concerning Kern's claims and its counterclaims and is now moving for summary judgment to dismiss Kern's claims

and to find Kern liable on each of its counterclaims.

As will be demonstrated below, the undisputed facts in this case establish that Kern's claims are factually and legally baseless. Indeed, the undisputed record establishes that: (i) the Connecticut Wage Payment Statute cannot be applied extraterritorially and, therefore, does not apply in this case; (ii) Kern was paid all earned wages by EDR; (iii) EDR's non-compete agreements are valid and enforceable; (iv) EDR had legitimate non-discriminatory reasons for terminating Kern's employment; and (v) Kern was apprised by EDR of the substance of its counterclaims *before* he filed his EEOC charge and, therefore, the counterclaims were not filed in retaliation for Kern filing an EEOC charge. Moreover, the record necessitates the entry of a judgment against Kern on EDR's counterclaims because: (i) Kern has not answered EDR's counterclaims and, therefore, the allegations in the counterclaims are deemed admitted (FED. R. CIV. P. 8(d)); (ii) Kern became an agent of EDR's direct competitor in violation of his non-competition agreements; and (iii) Kern admits that he submitted expenses for reimbursement that were in excess of that which he actually incurred.

Kern's Complaint and deposition are replete with conclusory allegations, bald assertions, and conjecture. These allegations, however, are unworthy of credence and fail to controvert the undisputed facts in this case. As there is no genuine issue of material fact, EDR is entitled to judgment as a matter of law on all counts raised in Kern's Complaint. Moreover, because Kern has not answered EDR's counterclaims, EDR is entitled to summary judgment as to Kern's liability on its counterclaims.

## STATEMENT OF FACTS

### Environmental Data Resources, Incorporated – The Company

EDR is a national provider of environmental information. Declaration of Robert Barber ("Barber Decl."), at ¶ 3 (attached as Tab 1 to Appendix in Support of Defendant's Motion for Summary Judgment ("Appendix")). Among its numerous products, EDR offers current and historical environmental risk management information, training workshops, and state-of-the-art online services, which include interactive mapping. Id. EDR is incorporated in Delaware and has its headquarters in Southport, Connecticut. Id. To service its clients, EDR has managers and salespersons nationwide, each assigned to specific regions selling specific products. Id.

### Kern's Employment with EDR

On June 23, 1994, EDR's then Vice President of Sales, Brian McCarter ("McCarter"), sent Kern an offer of employment to begin working on July 5, 1994, as the Southern Regional Manager for EDR, at a salary of $37,500 annually. See Tab 2 to Appendix. See also Charles W. Kern Deposition Transcript ("Kern Tr.") at 13-14 (Tab 3 to Appendix). Kern was forty years of age at the time he was offered employment with EDR. Kern Tr, 9, 133.

EDR's offer of employment to Kern provided that it was contingent on Kern's acceptance of a confidential non-compete agreement. See Tab 2 to Appendix. On July 25, 1994, Kern signed a Non-Compete and Confidentiality Agreement ("1994 Agreement"). See Tab 4 to Appendix. See also Kern Tr. 12. The 1994 Agreement provided, inter alia: "Employee hereby agrees that he or she will not for a period of two (2) years from the date of Employee's resignation or termination from the Company, alone or with others, directly or indirectly, own, manage, operate, control, participate in the ownership, management, operation or control of, be employed by, contract with, be an agent of, consult with, advise, assist, aid, associate with or be connected in any other manner with any proprietorship, firm, corporation, partnership, joint

4

venture or other entity <u>engaged in a competing business that engages in the collection</u>

<u>manipulation and distribution of government information about hazard/Toxic sites</u>, (the

"Company Business"), <u>or solicit</u> (by in-person visits, marketing, promotion, mail or telephone

solicitation and/or advertising) <u>any of the Company Business in the United States</u> (the "Non-

Competition Territory")." <u>See</u> Tab 4 to Appendix (emphasis added).

### The Restructuring

In May 2000, EDR determined that it needed to modify its business structure and its sales

and marketing efforts. <u>See</u> Barber Decl. at ¶ 7. Specifically, the business structure was modified

to create three separate business units: EDR, The Strategis Group, and the Sanborn Map

Company. Barber Decl. at ¶ 7. Previously, EDR sales personnel had been responsible for selling

numerous products for each of these companies. However, EDR determined that going forward

sales personnel would focus their efforts and sell products for only one of the business units.

Barber Decl. at ¶ 7.

After the business restructuring, Kern was offered a new employment relationship with

EDR, which he accepted in May 2000. <u>See</u> Tab 6 to Appendix. Under the new employment

relationship, Kern would sell only EDR products and would focus exclusively on selling

environmental information in the State of Florida. Kern Tr. 47. Kern did not request to keep his

old market regions or to sell the other products he had formerly sold when he accepted the new

employment offer. Kern Tr. 47.

On May 15, 2000, Kern received the new employment agreement with new restrictive

covenants memorializing his  new relationship with EDR ("2000 Agreement"). Kern Tr. 37-38.

<u>See</u> <u>also</u> Tab 6 to Appendix. Kern's new employment offer included a salary at an annual rate of

$42,333. Kern Tr. 43. <u>See</u> <u>also</u> Tab 6 to Appendix. Kern signed the 2000 agreement on May

17, 2000. Kern Tr. 39-40; Tab 7 to Appendix.

The 2000 Agreement, wherein Kern acknowledged receipt of, *inter alia*, ten dollars in consideration for signing the agreement, provided: "Employee hereby agrees that for a period of one (1) year from the date of Employee's resignation or termination from the Company, he or she shall not: (a) alone or with others, directly or indirectly, own, manage, operate, control, participate in the ownership, management, operation or control of, be employed by, contract with, be an agent of, consult with, advise, assist, aid, associate with or be connected in any other manner with any proprietorship, firm, corporation, partnership, joint venture or other entity that: (i) engaged in the collection, development, packaging, and sale or licensing of historical, governmental, geographical, environmental, telecommunications data and information, and informational products or services relating to real estate and/or telecommunications industry (the "Company Business"); or (ii) solicit (by in-person visits, marketing, promotion, mail or telephone solicitation and/or advertising) any of the Company Business in the United States (the "Non-Competition Territory")." See Tab 7 to Appendix (emphasis added).

EDR's Expense Report Policy

EDR's Expense Report Policy ("Expense Policy") provides that employees will be reimbursed for all "reasonable expenses incurred while traveling on authorized company business." See Tab 8 to Appendix. See also Tab 9 to Appendix; Kern Tr. 99. Pursuant to the policy, on a weekly basis, Kern, as well as all other regional managers, was required to submit a Report of Business Expenses wherein he would enter his travel expenses for the week to obtain reimbursement from EDR. Kern Tr. 49-50. With regard to meals, EDR's policy specifically states that employees will be reimbursed "for all REASONABLE meals while on company time only." See Tab 8 and 9. (emphasis in original).

## Kern's Fraudulent Expense Reimbursement Submissions

In July 2002, Kellyann Barberio ("Barberio") discovered that, on more than one occasion, Kern had submitted the same bill for reimbursement more than once. See Barber Decl. at ¶ 11. Ms. Barberio sent an e-mail to Kern identifying these issues and copied Robert Barber ("Barber"), the then Chief Operating Officer of the company on the e-mail. See Barber Decl. at ¶ 12. Upon receipt of the e-mail, Mr. Barber became concerned by these "errors" and decided to conduct an audit of Kern's Business Expense Reports for the prior six months. See Barber Decl. at ¶ 12. The audit uncovered the fact that Kern had engaged in wide-ranging and repeated acts of expense reimbursement fraud. See Barber Decl. at ¶ 13. For example, Kern submitted a phone bill for reimbursement with his June 29, 2002 report. Id. However, Kern had previously submitted the very same bill twice before (on March 1 and April 18). Id. Similarly, Kern twice submitted the identical $49.99 internet charge for reimbursement (June 1 and June 15) and twice submitted the same $44.57 phone bill for reimbursement (June 15 and June 29). Id. These duplicative submissions resulted in EDR paying Kern monies in excess of that which he actually incurred for business related matters.

In addition to the duplicative submission of expenses for reimbursement, Kern submitted receipts for meals he had at restaurants within ten miles of his home *after* he had concluded his work for the day as business expenses. See Tabs 10-13 to Appendix. These submissions resulted in EDR paying for Kern's personal non-business related dinners. As just a few examples:

- For the week ending April 20, 2002, Kern traveled to see clients in Miami, Boca Raton, Pompano and Fort Lauderdale, Florida. Kern Tr. 49-50. That week, Kern submitted a receipt for a meal reimbursement each day. See Tab 10 to Appendix. On April 16, 2002, Kern submitted a receipt for an **$18.52 *lunch***. Critically, however, he signed the credit card receipt at 8:26 p.m., at a Ruby Tuesday restaurant 2 miles from his house in Coconut Creek, Florida. Kern Tr. 51-52. See also Tab 10 to Appendix.

- Similarly, for the week ending April 27, 2002, Kern submitted a Report of Business Expenses that indicated that he had traveled to Fort Lauderdale, Hollywood, Boca Raton and Miami, Florida. See Tab 11 to Appendix. For April 23, 2002, on which date he traveled to Boca Raton, Kern submitted a receipt for an **$18.52 *lunch***. However, he signed the credit card receipt at 7:04 p.m., at a Ruby Tuesday restaurant about 2 miles from his house in Coconut Creek. Kern Tr. 56-57.

- For the week ending May 18, 2002, Kern submitted a Report of Business Expenses indicating that he had traveled to Fort Lauderdale, Delray, Hollywood, Winter Park and West Palm Beach. See Tab 12 to Appendix. On May 15, 2002, he traveled to Hollywood. For that day, Kern submitted a receipt for a $17.82 *lunch*. However, he signed his credit card receipt at 6:18 p.m., at a restaurant called Tokyo Delight, which is about 5 miles from his house in Coconut Creek.

- For the week ending May 25, 2002, Kern reported that he had traveled to Boca Raton, Orlando and Miami. See Tab 13 to Appendix. On May 22, 2002, he went to Orlando and came home to Coconut Creek that same day. Kern Tr. 67-68. After he arrived home, he had a meal at Tokyo Delight, the restaurant near his house in Coconut Creek, and signed his credit card receipt at 6:33 p.m. Id. The next day he went to Miami, and after he returned home, he had a $19.97 meal and signed the credit card receipt at around 2 p.m. at a restaurant called the Whale's Rib, which is less than ten miles from his home. Kern Tr. 69-71.

### Kern's Termination

On July 10, 2002, Kern had a conversation with Mr. Barber wherein he was informed about the fraudulent submission of his cellular phone bill. Kern Tr. 83-84. Mr. Barber explained to Kern that EDR was terminating him from his employment with EDR because of his accounting errors. Kern Tr. 84. The next day, EDR sent Kern a termination letter. See Tab 14 to Appendix. After Kern's employment with EDR was terminated in July 2002, he had seven (7) unused holiday and vacation days. Barber Decl. at ¶ 21. While not obligated to provide any payment, EDR paid Kern for these seven days of accrued and unused vacation in hopes Kern would abandon his baseless claims against the company. Barber Decl. at ¶ 21. He received a check from EDR for the accrued vacation pay subsequent to his termination. Kern Tr. 99.

### Kern's Actions Following his Termination

After Kern's employment with EDR was terminated, he incorporated a company in Florida called "Environmental Reports, Inc." ("ERI"). Kern Tr. 105. ERI's only employee is

Kern and it maintains its principal place of business at 3540 N.W. 71st St., Coconut Creek,

Florida -- Kern's home address. Id. About thirty days after he was terminated from EDR, Kern

contacted Edward "Tad" Mickler ("Mickler") at First Search, seeking job opportunities. Kern

Tr. 100, 102, 104, 117. First Search is a direct competitor of EDR. Kern Tr. 102, 104. At the

time that Kern was seeking new employment opportunities, he was aware of the fact that he had

an operative non-compete agreement with EDR. Kern Tr. 102-103. Nevertheless, on October

25, 2002, ERI entered into an independent contractor agreement with First Search whereby Kern

would act as a sales representative for First Search and sell environmental information services,

historical reference information, and radius, linear, corridor, area and NEPA reports -- all

products he had sold as an employee of EDR. Kern Tr. 102, 105-107. See Tab 15 to Appendix.

The agreement entered into between ERI and First Search was for no specific period of

time and could be terminated by First Search at any time. Kern Tr. 118. Incorporated into this

agreement was a list of seventeen (17) National Accounts that were currently and actively doing

business with First Search. See Tab 15 to Appendix. Some of the clients whose accounts Kern

would solicit as part of his new agreement with First Search had operations in Florida, such as

ATC, MacTec, PSI and Terracon. Kern Tr. 107-108. Kern had dealt with these clients while he

was employed with EDR. Kern Tr. 109, 116. As a result of his previous contact with these

clients at EDR, Kern had gained an understanding of the necessities and interests each individual

company had in terms of pricing and products. Kern Tr. 110-113. After he began working for

First Search, Kern communicated with these companies, claiming he could offer lower prices

than the prices offered by EDR. Kern Tr. 114.

<u>EDR Discovers Kern's Breach of His Non-Compete Agreements</u>

On November 25, 2002, after learning that Kern might have become an agent of First

Search in a capacity that would violate his non-compete agreements, *and prior to Kern filing his*

*EEOC charge against EDR*, Mr. Barber wrote Kern a letter reminding him that he had continuing contractual, legal, and ethical obligations to EDR. Barber Decl. at ¶ 17. See also Tab 16 to Appendix. On November 25, 2002, Mr. Barber also wrote a letter to Mickler at First Search informing him about Kern's continuing contractual, legal and ethical obligations to EDR. See Tab 17 to Appendix.

On January 13, 2003, Kern received a letter from First Search terminating their contractual relationship. Kern Tr. 119. First Search terminated its relationship with Kern because it did not want to continue disbursing the monthly retainer and travel reimbursements it was paying Kern. See Tab 18 to Appendix. See also Kern Tr. 119. Indeed, the January 13, 2003, termination letter expressly sets forth this reason for its decision. See Tab 18 to Appendix. Critically, after First Search terminated its contractual relationship with Kern, it continued to use Kern's services. Kern Tr. 120.

Since July 12, 2003, Kern has contacted EDR customers in Florida, such as Nutting, E-Pack, ECT, URS, Qore, Enviro Design, EE&G, ATC, MacTec, and Ardaman, in an effort to divert this business from EDR. Kern Tr. 124-125. When contacting these companies, Kern has been universally recognized as a former EDR managerial employee. Kern Tr. 126.

<u>Kern's Age Discrimination Claim</u>

Kern testified at his deposition that he had been told by a former colleague at EDR, Allyson Dussault, that she had errors in her business expense reports in the past. Kern Tr. 132. This is Kern's lone evidence of alleged age discrimination and he does not even know if Ms. Dussault's statements are true. Kern Tr. 133. Kern has no first-hand knowledge concerning this information, nor does he know if Mr. Barber had any knowledge of the facts and circumstances concerning Ms. Dussault. In fact, the undisputed record establishes that Mr. Barber had no knowledge of these alleged facts. See Barber Decl. 14. Kern, however, is aware that Mr. Barber

has terminated EDR employees under the age of forty for a variety of reasons. Kern Tr. 133-134.

### EDR'S Counterclaims

EDR contemplated filing claims against Kern once it learned of his expense reimbursement fraud and once his employment with EDR was terminated (and before he filed his charge with the EEOC). Indeed, Kern has acknowledged that EDR raised the issue of filing claims against him immediately after his employment was terminated, while EDR was trying to negotiate a separation agreement. See Kern Tr. 138 ("they spoke of counterclaims in the separation agreement."). Accordingly, the notion that EDR has filed counterclaims against Kern because he filed a charge with the EEOC is baseless and belied by the facts in this case.

Moreover, more than eight months after EDR filed and served its counterclaims, Kern has still not answered EDR's counterclaims. See Docket. Therefore, as contemplated by the Federal Rules of Civil Procedure, the allegations in EDR's counterclaims must be deemed admitted, and an order of liability on EDR's counterclaims should be entered.

Finally, as to the substance of the counterclaims, the record establishes liability, as a matter of law, on these claims. It is undisputed that Kern breached his non-compete agreements, interfered with EDR's business relationships, converted EDR property, and engaged in a wide-ranging practice of expense reimbursement fraud.

### **ARGUMENT AND CITATION OF AUTHORITY**

FED. R. CIV. P. 56(c) provides that summary judgment "shall be rendered forthwith" if it is shown "[t]hat there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 n.4 (1986); Rosen v. Thornburgh, 928 F.2d 528, 532 (2d Cir. 1991). A defendant

moving for summary judgment meets its burden simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case," it need not negate the plaintiff's alleged case. Celotex, 477 U.S. at 323. Federal courts are required to grant summary judgment unless the non-moving party comes forward with affirmative evidence demonstrating a genuine issue of material fact to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

To prove that a genuine issue of material fact exists, a plaintiff may not rest upon the mere allegations or denials of the pleadings. FED.R.CIV.P. 56(e); see, e.g., JSP Agency, Inc. v. American Sugar Ref. Co., 752 F.2d 56, 59 (2d Cir. 1985). Rather, the plaintiff must, by affidavit or otherwise, "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see also Anderson, 477 U.S. at 248; West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co., 78 F.3d 61, 63 (2d Cir. 1996). Mere conclusory allegations or opinions are not evidence, and cannot by themselves create a genuine issue of material fact. See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980). Nor can a motion for summary judgment be defeated merely upon a 'metaphysical doubt' concerning the facts . . . or on the basis of conjecture or surmise." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citations omitted). Kern has not adduced the affirmative, non-speculative evidence required by Rule 56, and summary judgment is, therefore, warranted on all of his claims.

## I. THIS COURT LACKS JURISDICTION OVER KERN'S CLAIM UNDER THE CONNECTICUT WAGE PAYMENT STATUTE

Kern asserts a claim under the Connecticut Wage Payment Statute, Connecticut General Statutes § 31-71(c) and (k), alleging that EDR failed to pay him certain compensation. See Compl. Count I. However, Kern's claim must be dismissed as a matter of law because he admits

that he lived in Florida during his entire tenure with EDR and was never employed by EDR in

Connecticut. Kern Tr. 16-17. The Connecticut Superior Court decision in Kubas v. Hartford

Financial Services, Co., No. X07CV 000073192S, 2000 WL 1170237 (Conn. Sup. July 19,

2000) provides guidance.[1] In Kubas, the Connecticut Superior Court addressed a similar

situation and dismissed a wage payment complaint. In striking the Connecticut wage payment

claim, the Court reasoned:

> The plaintiff seeks to bring a class action pursuant to Connecticut wage
> payment laws on behalf of individuals employed outside the state of
> Connecticut. Individuals employed outside the state of Connecticut are
> subject to wage payment laws of the states in which they are employed
> and are not afforded the protection of the Connecticut statute.

Kubas, 2000 WL 1170237, at * 2.

In this case, there is no dispute that Kern was never employed in Connecticut.

Accordingly, Kern should not be permitted to avail himself of the Connecticut Wage Payment

Statute and his claim should be dismissed as a matter of law.

## II.    KERN'S TORTIOUS INTERFERENCE CLAIM FAILS AS A MATTER OF LAW

Count II of Kern's Complaint alleges a tortious interference with contract claim. Because

discovery has confirmed that Kern has no competent and admissible evidence that would render

EDR liable for tortious interference with contract, summary judgment should be entered

dismissing this claim. Indeed, the record establishes unequivocally that EDR did not interfere

with any of Kern's contractual relationships and that his business relationship with First Search

continued undeterred.

Under Connecticut law, to establish a cause of action for tortious interference with

contract, a plaintiff must establish: (i) the existence of a contractual relationship; (ii) the

---

[1]     In accordance with the Local Rules, attached at Tab A please find a copy of all unreported
        decisions cited in this Memorandum of Law.

defendant's knowledge of that relationship; (iii) the defendant's intent to interfere with the relationship; (iv) that the interference was tortious; and (v) that a loss suffered by the plaintiff was caused by the defendant's conduct. <u>Appleton v. Board of Education</u>, 254 Conn. 205, 212-13, 757 A.2d 1059 (2000); <u>see also</u> <u>Subsolutions, Inc. v. Doctor's Associates, Inc.</u>, 62 F. Supp. 2d 616, 628 (D. Conn. 1999); <u>McKeown Distrib., Inc. v. Gyp-Crete Corp.</u>, 618 F.Supp. 632, 644 (D. Conn. 1985) (quoting <u>Busker v. United Illuminating Co.</u>, 156 Conn. 456, 461, 2452 A.2d 708, 711 (1968)).

In this case, Kern has failed to establish: (i) that EDR knew he had a contractual relationship with First Search; (ii) that EDR intended to interfere with that relationship; (iii) that any interference was tortious; or (iv) that any loss was occasioned by EDR's intentional conduct. On the contrary, Kern has produced documents that establish that EDR had nothing to do with the loss he now attempts to blame on EDR.

A.     <u>EDR Had No Knowledge of A Contract Between First Search and Kern</u>

Kern contends that EDR "knew of the plaintiff's contractual relationship." Complaint ¶ 106. However, Kern has failed to adduce any admissible evidence to establish this point. The undisputed record establishes that EDR was unaware of whether or not Kern was employed by First Search and what, if any, relationship Kern had with First Search. <u>See</u> Appendix Tab 17 ("please provide me with written confirmation that Mr. Kern is not employed by First Search and that First Search has not received and is not now in possession of any confidential EDR documents or information."). For this reason alone, Kern's claim should be dismissed.

B.     <u>EDR Did Not Intentionally Interfere With Any Contractual Relationship</u>

Kern claims that EDR intentionally interfered with his contractual relationship with First Search. Complaint ¶ 107. This too is a conclusory allegation without any record support. The

undisputed record establishes that EDR contacted First Search to make certain that Kern was

complying with his continuing contractual, legal, and ethical obligations to EDR. At no time did

EDR ever intentionally interfere with any known contractual relationship (or any business

opportunities) of Kern. For this reason, Kern's claim should be dismissed.

C.     Kern Has Failed To Show Any Tortious Conduct By EDR

Assuming *arguendo* that EDR did know that Kern had a valid contractual relationship

with First Search, it did not tortiously interfere with Kern's contractual relationship. The law is

well-settled that "not all conduct that interferes with a business relationship is actionable."

Subsolutions, Inc. v. Doctor's Associates, Inc., 62 F. Supp. 2d 616, 628 (D. Conn. 1999)

(quoting Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 130 (D. Conn. 1993)).

Indeed, a plaintiff bears the burden of proving that the defendant's conduct was tortious.

Subsolutions, 62 F. Supp. 2d at 628 (citing McKeown, 618 F. Supp. at 644). To make such a

showing, a plaintiff may present evidence of fraud, misrepresentation, intimidation, obstruction

or molestation, or malicious actions. Id.; see also McKeown, 618 F.Supp. at 644 (citing Skene v.

Carayanis, 103 Conn. 708, 714, 131 A. 497 (1926)). Here, Kern has woefully failed to satisfy

this burden. EDR's actions and interests in contacting First Search about Kern's continuing

contractual, legal, and ethical obligations to EDR were privileged and justified, and can hardly

be characterized as fraudulent or malicious. Accordingly, Kern's claim is fatally defective.

D.     EDR's Acts Were Not The Cause of Kern's Loss

Perhaps the most glaring defect in Kern's claim is the fact that EDR did not cause any

loss to Kern. To prevail on a tortious interference with contract claim, a plaintiff must prove that

the defendant's conduct was the cause of a loss suffered by the plaintiff. McKeown Distrib., Inc.

v. Gyp-Crete Corp., 618 F.Supp. 632, 644 (D. Conn. 1985). Here, the undisputed evidence

Kern. Specifically, the letter from First Search to Kern, explaining that it was terminating their contractual relationship, provided "we as a network no longer wish to be bound to pay the monthly retainer or travel reimbursement." See Appendix Tab 18. Accordingly, the documentary evidence establishes that business reasons, not EDR, caused First Search to terminate its contractual relationship with Kern.

Finally, while Kern's claim is plead as a tortious interference with contract claim, it is important to note that First Search and Kern *continued to have a business relationship* after First Search decided to terminate the contractual relationship in accordance with the terms of the contract. See Kern Tr. 120. Therefore, to the extent Kern contends EDR interfered with his business opportunities, that claim would also require immediate dismissal.

## III.   PLAINTIFF'S CLAIM FOR UNREASONABLE NON-COMPETE COVENANTS

Count III of Kern's Complaint asks this Court to declare EDR's non-compete agreements void and to enjoin EDR from enforcing their provisions because they are overly broad. In addition to attacking the validity of the agreements, it appears that Kern is disputing the enforceability of both agreements because the 2000 Agreement was not supported by sufficient consideration. However, the record is clear that Kern acknowledged receipt of ten dollars in consideration for the 2000 agreement, in addition to the fact his new employment relationship was conditioned on its acceptance. See Appendix Tab 7. Moreover, even assuming Kern is correct that the 2000 agreement was unenforceable for lack of consideration, the 1994 agreement would, therefore, not be superseded and would still be fully enforceable. See, e.g., Timely Prods. Inc. v. Constanzo, 465 F.Supp. 91 (D. Conn. 1979)(finding that it is a general principle of contract law that when an unenforceable substituted agreement is nullified both as an executory

agreement and as a discharge of a prior contract, the prior agreement remains enforceable); Airs Int'l v. Perfect Scents Distributions, Ltd., 902 F.Supp. 1141, 1148 (N.D.Cal. 1995) (applying California law and holding that "the substituted contract may itself be voidable for fraud...or other reasons; and if [voidable] ... [t]he prior [contract] then becomes enforceable again."). C.f. Restatement of Contracts § 223(2) ("If a contract to vary a contract or to substitute another contract in its stead is unenforceable because of failure to satisfy the requirements of the Statute, the prior contract is not thereby rescinded, or, except as stated in § 224, varied.")

The law is well-settled that a restrictive covenant that restricts the activities of an employee following employment is valid and enforceable if the restraint is reasonable. Scott v. General Iron & Welding Co., 171 Conn. 132, 137, 362 A.2d 111 (1976). To determine the reasonableness of a restrictive covenant under Connecticut law, courts look at the following factors: (i) the length of the time restriction; (ii) the geographical scope of the restriction; (iii) the protection afforded the employer; (iv) the extent of restraint on the employee's ability to pursue his occupation; and (v) the extent of any interference with the public interest. Branson Ultrasonics Corp. v. Stratman, 92 F.Supp. 909, 913 (D. Conn. 1996); H & R Block Eastern Tax Servs., Inc. v. Brooks, No. 00-1332, 2000 WL 33124809, *3 (D. Conn. Oct. 12, 2000) (quoting AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995).

Whether or not the Court considers the 1994 or the 2000 agreement the operative agreement in this case, they are both reasonable and fully-enforceable.[2/] Specifically, applying the factors set forth in Stratman, the 1994 and 2000 agreements are reasonable in scope and fully enforceable. The 1994 agreement had a two year restrictive covenant and was limited to very

---

2/    Moreover, both agreements expressly permit judicial modification if the Court determines that any provision is determined to be overly broad. See Tab 4, ¶ 1; Tab 7, ¶ 1. Connecticut law permits judicial modification or "blue pencilling" of non-compete agreements. Gartner Group Inc. v. Mewes, No. CV 91 0118332 S, 1992 WL 4766, at * 4-5 (Conn. Super. Ct. Jan. 3, 1992).

specific industries: those that engage in "collection manipulation and distribution of government information about hazard/Toxic sites." See Appendix Tab 4. The 2000 agreement had a shorter time restriction -- one year -- and applied to a slightly larger, but still finite group of industries: those engaging in "historical, governmental, geographical, environmental, telecommunications data and information, and informational products or services relating to real estate and/or the telecommunications industry." See Appendix Tab 7. While the 2000 agreement was slightly broader than the narrowly tailored 1994 agreement, it expressly permitted any and all kinds of environmental consulting during the period of restraint. See Tab 4, ¶ 1. Therefore, the 2000 agreement could not conceivably be construed as unnecessarily restraining Kern's ability to earn a livelihood.

In light of the precedent from the state of Connecticut, both the 1994 and 2000 agreements are valid and fully-enforceable. Indeed, Connecticut courts have repeatedly found restrictive covenants of one to two years reasonable. See Stratman, 921 F.Supp. at 913 (restriction in non-compete covenant lasting only one year was reasonable); Minnesota Mining & Mfg. Co. v. Francavilla, 191 F. Supp. 2d 270, 280 (D. Conn. 2002) (two-year limit in covenant was reasonable); Robert S. Weiss & Assocs., Inc. v. Wiederlight, 208 Conn. 525, 546 A.2d 216 (1988) (covenant not to compete which, upon termination of employment, barred employee from selling insurance to customers of employer for two years was reasonable); Torrington Creamery Inc. v. Davenport, 126 Conn. 515, 520, 12 A.2d 780 (1940) (same). Similarly, courts have routinely found restrictive covenants tailored to specific industries to be reasonable in scope. See Hopper D.M.V. v. All Pet Animal Clinic, Inc., 861 P.2d 531, (Wyo. 1993) (finding that broad geographic restriction in covenant not to compete may be reasonable when it is coupled with specific activity restriction within industry or business which has inherently limited client



CASE NO. 303-CV-0233-AVC

base). This is so even where, as here, the restriction is on a nationwide basis. See Francavilla, 191 F. Supp. 2d 270, 280 (D. Conn. 2002) (finding geographic scope of non-compete provision reasonable where employee was prohibited from accepting employment with competitors in the United States or any other country in which employer had manufacturing plant or provided service that employee was involved with during employment).

Therefore, because the 1994 and 2000 agreements were reasonable in scope, Kern's contention that the agreements should be voided and enjoined as a matter of law should be rejected and dismissed.

## IV. PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT FOR PAYMENT OF WAGES FAILS AS A MATTER OF LAW

Count IV of the Complaint purports to state a claim for breach of contract. Kern states in conclusory fashion that EDR failed to pay him pursuant to "the established policy of the Defendant," but fails to ever identify the "policy." See Compl. ¶ 186. At his deposition, Kern maintained that was entitled to accrued but unused vacation, holiday and sick days pursuant to the 2000 agreement (*the same agreement he claims is unenforceable because it lacks consideration*).

The 2000 agreement provided that Kern would be entitled to:

Vacation: . . .such reasonable vacations as may be allowed by the Company in accordance with established practices, but in any event not less than two (2) weeks during each twelve month period. In addition, you shall be entitled to six (6) paid holidays and four (4) paid floating holidays during each twelve month period. All vacation and paid holidays must be used in the twelve (12) month period in which they accrue.

Sick Leave: . . .such reasonable paid sick days as may be allowed by the Company in accordance with established practices, but in any event not less than five (5) days during each twelve (12) month period. All sick leave must be used in the twelve (12) month period in which it accrues.

See Appendix Tab 6.

A plain reading of the relevant provisions of the 2000 agreement fails to establish that Kern was entitled to any *payment* of vacation or sick leave at the end of his employment with EDR. See Appendix Tab 6. Moreover, putting aside the express terms of the 2000 agreement, Kern has utterly failed to establish that there was a "pattern" or "practice" at EDR that required EDR to pay out accrued, but unused vacation when an employee was terminated from the company. Accordingly, Kern's breach of contract claim should be dismissed.

Finally, while EDR had no legal obligation to do so, after Kern's employment was terminated, he had seven unused holiday and vacation days and EDR paid Kern for these seven days of accrued and unused vacation. Barber Decl. at ¶ 22. Therefore, as a matter of law, and for this additional reason alone, Kern's breach of contract claim must be dismissed.

## V.   KERN'S AGE DISCRIMINATION CLAIM MUST BE DISMISSED AS A MATTER OF LAW.

In Count V of Kern's Complaint, he alleges that his employment with EDR was terminated because of his age in violation of 29 U.S.C. § 626 et seq. To establish this claim, Kern bears the ultimate burden of proving intentional discrimination by a preponderance of the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 145 (2000). Kern must prove that the alleged impermissible consideration – in this case age – was a determinative factor in the adverse employment action about which he complains. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993) (finding that "[w]hatever the employer's decision-making process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.").

Where, as here, there is no direct evidence of discrimination, the plaintiff must proceed with an individual disparate treatment case under the three-step "shifting burdens" analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),

and clarified in <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993) and <u>Reeves</u>, 530 U.S.

133.  Under that analysis, a plaintiff must first establish a <u>prima facie</u> case of discrimination by a

preponderance of the evidence.  The burden of production then shifts to the defendant, who must

articulate a legitimate, non-discriminatory reason for its actions.  <u>Texas Dep't of Cmty. Affairs v.</u>

<u>Burdine</u>, 450 U.S. 248, 254 (1981).  Once the defendant has articulated a non-discriminatory

reason for its actions, any presumption of discrimination drops from the case, and the plaintiff

must prove by a preponderance of the evidence that the defendant's legitimate non-

discriminatory reason was not its true reason, but was a pretext for discrimination.  <u>Galabya v.</u>

<u>N.Y. City Bd. of Educ.</u>, 202 F.3d 636, (2d Cir. 2000) (applying <u>McDonnell Douglas</u> test to

ADEA cases).

     As will be discussed below, Kern cannot establish a <u>prima facie</u> case for age

discrimination.  Moreover, even assuming Kern could establish a <u>prima facie</u> case for age

discrimination, EDR has proffered a legitimate non-discriminatory reason for its action and Kern

has not adduced any admissible evidence to suggest this reason was a pretext for discrimination.

Accordingly, Kern's age discrimination claim should be dismissed as a matter of law.

     A.   <u>Kern Cannot Establish A Prima Facie Case Of Age Discrimination.</u>

     In order to establish a <u>prima facie</u> case of age discrimination based on a discharge under

the ADEA, a plaintiff must establish that: "(1) at the time of discharge he was at least 40 years of

age, (2) his job performance was satisfactory, (3) he was discharged, and (4) his discharge

occurred under circumstances giving rise to an inference of discrimination on the basis of age."

<u>Grady v. Affiliated Cent., Inc.</u>, 130 F.3d 553, 559 (2d Cir. 1997).

     While Kern can establish that he was over 40 years of age when he was discharged from

EDR, he cannot establish that he was performing his job satisfactorily or that his discharge

occurred under circumstances giving rise to an inference of discrimination.  Specifically, Kern's

job performance was not satisfactory considering EDR perceived him to be engaged in a wide-ranging pattern of fraud with respect to his expense reimbursements. Furthermore, there is no evidence in the record that his discharge occurred under circumstances giving rise to an inference of discrimination. On the contrary, the record reveals that the Kern was consistently treated fairly. Kern was 40 years old, and thus in the protected group, when he was hired. See Wolf v. Buss (America) Inc., 77 F.3d 914, 923-24 (7th Cir. 1996) (fact that the defendant hired plaintiff at the age of 50, is somewhat indicative of defendant's lack of discriminatory intent). Moreover, the record establishes that, while employed by EDR, Kern was not subjected to disparate treatment, was not subject to discriminatory or harassing comments, and, for all relevant times, was treated fairly. Indeed, Kern testified that he had a "cordial" and "pleasant" relationship with Mr. Barber, the decision-maker (Kern Tr. 84), and that he enjoyed his employment with EDR. See Kern Tr. 34.

      B.      EDR Has Articulated A Legitimate Non-Discriminatory
                  Reason For Terminating Kern And Kern Cannot Establish that
                  The Proffered Reason Is A Pretext For Age Discrimination

Even if Kern could establish a prima facie case of discrimination, he cannot deny that EDR has articulated a legitimate, non-discriminatory reason for its decision to terminate his employment. Namely, EDR perceived that Kern was engaging in fraudulent activities. Gomez v. Pellicone, 986 F. Supp. 220 (S.D.N.Y. 1997) (finding that falsification of time records was a legitimate non-discriminatory reason for discharge); Sanyer v. Kimberly Quality Care, 971 F. Supp. 86 (E.D.N.Y. 1997) (finding that submission of an inaccurate time sheet was a legitimate non-discriminatory reason for discharge).

Here, Mr. Barber reviewed Kern's expense reimbursement reports and determined that Kern had engaged in wide-ranging practice of fraud with regard to his expense reimbursement

reports. See Barber Decl. ¶ 13. Accordingly, Mr. Barber made the decision to terminate Kern's

employment. See Barber Decl. ¶ 13. The facts are undisputed that on more than one occasion,

Kern submitted the same bill for reimbursement more than once, which resulted in damage to

EDR. See Barber Decl. ¶ 13. The record is equally undisputed that Kern submitted bills for

reimbursement that EDR believed were incurred for non-business related matters. See Barber

Decl. ¶ 13. And, on numerous occasions, Plaintiff submitted receipts for dinners he had at the

conclusion of his work day within a few miles from his house. See Barber Decl. ¶ 13. Thus,

EDR made the reasonable decision to terminate Kern for what it believed to be fraudulent

expense reimbursement submissions.

Kern has not offered any evidence to establish that EDR's proffered reason for its action

was a pretext for age discrimination. As such, Kern's age discrimination claim must be

dismissed as a matter of law. The law is well settled that: "provided that the proffered reason is

one that might motivate a reasonable employer, an employee must meet that reason head on and

rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."

Chapman v. AI Transport, 229 F.3d 1012, 1026 (11th Cir. 2000); Rosen v. Columbia Univ., No.

92 Civ. 6330, 1995 WL 464991, at *7 (S.D.N.Y. August 7, 1995), ("it is the perception of the

decision-maker, and not that of plaintiff, which is relevant. Simply because plaintiff's

perceptions of his own qualifications differ from those of his employer does not entitle [the

Court] to delve into the question of which portrayal is the correct one because this Court does not

sit as a super-personnel department that reexamines an entity's business decisions."), aff'd, 101

F.3d 108 (1996).

EDR has stated unambiguously that Kern was terminated because of management's

perception that he was engaging in a practice of submitting fraudulent expenses for

reimbursement. While Kern may disagree with EDR's wisdom, he cannot ask this Court to

second-guess EDR's business decision. See Moylan v. National Westminster Bank USA, 687 F.

Supp. 54, 59 (E.D.N.Y. 1988) (stating that "[i]t is not the function of the judiciary to second-

guess ordinary business decisions . . . . It is the employer's perception of the plaintiff, not the

plaintiff's perception of himself, that is relevant.. .").

    In discrimination cases, the plaintiff must do more than simply allege pretext. Earley,

907 F.2d at 1081. Indeed, a plaintiff must "'introduce significantly probative evidence showing

that the asserted reason is merely a pretext for discrimination.'" Zaben, 129 F.3d at 1457

(citation omitted). See also Webb v. R&B Holding Company, Inc., 992 F. Supp. 1382, 1387

(S.D. Fla. 1998) (holding that "[c]onclusory allegations of discrimination, without more, are not

sufficient to raise an inference of pretext or intentional discrimination."). In this case, Kern has

not produced any evidence to establish that EDR's proffered reason is a pretext for

discrimination. Without more, he cannot withstand this summary judgment motion.

    While Kern alleged in his deposition that a younger employee, Allyson Dussault, was

treated differently, he has not produced any admissible evidence to substantiate this conclusory

allegation. Kern's claim that *he was told* by Allyson Dussault that she submitted erroneous

expenses for reimbursement is flawed for two separate reasons. First, this "evidence" is hearsay

and cannot serve to oppose a properly supported motion for summary judgment. See Santos v.

Murdock, 243 F.3d 681, 684 (2d Cir. 2001) (finding that "[a]ffidavits submitted to defeat

summary judgment must be admissible themselves. . . ."); Sarno v. Douglas Elliman-Gibbons &

Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999) (holding that hearsay statement "did not constitute

competent evidence" and thus could not be considered in opposition to motion for summary

judgment); Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 923 (2d

Cir. 1985) (noting that it is well-settled that a party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment"). Indeed, Kern himself has no idea whether Ms. Dussault ever submitted erroneous reimbursement requests or did so to the same degree as Kern. See Kern Tr. 133. Second, it is undisputed that that the decision-maker in this case, Robert Barber, was not aware that Ms. Dussault engaged in similar conduct, see Barber Decl. 14, and thus Kern cannot show that he was treated differently than any other employee because of his age. As Kern has no admissible evidence to establish that EDR's proffered reason for its action was a pretext for age discrimination, Kern's age discrimination claim must be dismissed.

## VI.    PLAINTIFF'S CLAIM FOR RETALIATION FAILS AS A MATTER OF LAW

Subsequent to EDR's filing of its Answer, Affirmative Defenses, and Counterclaims, Kern amended his complaint to include two additional claims against EDR -- the age discrimination claim previously discussed and a claim of retaliation under the ADEA. Kern claims that EDR "filed spurious and vexatious claims against the plaintiff as counterclaims in this present action" in retaliation for his filing a charge with the EEOC. Compl. at ¶¶ 267, 269. As will be established below, Kern's claim is baseless and, indeed, disingenuous.

A claim for retaliation under the ADEA is analyzed under the McDonnell Douglas three-part burden shifting analysis. Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 94 (2d Cir. 2001); Reed v. A.W. Lawrence & Co., 95 F.3d 1170 (2d Cir. 1996). To establish a prima facie case for retaliation under the ADEA, a plaintiff must establish that: (i) he engaged in protected activity known to the defendant; (ii) he suffered an adverse "employment action"; and (iii) there is a causal connection between the protected activity and the adverse employment action. Id. As previously discussed, if the plaintiff establishes the prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, non-retaliatory

reason for its actions. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). Once

the defendant has articulated a non-retaliatory reason for its actions, the plaintiff must prove by a

preponderance of the evidence that the defendant's legitimate non-retaliatory reason was not its

true reason, but rather a pretext for retaliation.

A.     <u>Kern Cannot Establish A Prima Facie Case</u>

Kern's contention that EDR filed its counterclaims in retaliation for his filing of an

EEOC Charge is specious at best. The record establishes that there is no causal connection

between Kern's protected activity and the alleged adverse employment action. Indeed, there is

no dispute that EDR raised the issue of filing claims against Kern five months before he filed his

EEOC charge, while EDR was trying to negotiate a separation agreement. <u>See</u> Kern Tr. 138

("they spoke of counterclaims in the separation agreement."). Moreover, on November 25, 2002,

*one month before Kern filed his Charge with the EEOC*, EDR sent Kern a letter apprising him of

its concern that he was acting in violation of his non-compete agreements. <u>See</u> Appendix Tab

16. Indeed, the very concerns raised by EDR in its November 25, 2002 letter form the basis of

Counts IV, V, and VI of EDR's Counterclaim and the law is well-settled that a retaliation claim

cannot arise from conduct that proceeded the filing of a charge. <u>See</u>, <u>e.g.</u>, <u>Castro v. New York</u>

<u>City Bd. of Educ. Pers.</u>, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("It

is unreasonable to infer that the continuation of behavior that had preceded the filing of plaintiff's

complaint was somehow motivated by that complaint."); <u>Bennett v. Watson Wyatt & Company</u>,

136 F. Supp. 2d 236 (S.D.N.Y. 2001), <u>aff'd</u>, 2002 WL 31628399 (2d Cir. 2002) (same).

Similarly, with regard to the remaining Counts of EDR's Counterclaim ( Counts I, II, and

III), these are the claims that arise from the conduct that prompted EDR to terminate Kern in July

2002. Specifically, EDR has asserted claims for unjust enrichment, fraud, and conversion based

upon Kern's fraudulent submission of fabricated and/or duplicative expense reimbursement reports. Kern was terminated for these acts in July of 2002, *five months before he filed his charge with the EEOC*. Kern cannot dispute the fact that he received an e-mail from Kellyann Barbiero that addressed the fact he had submitted duplicative receipts for reimbursement and that Mr. Barber had raised this issue with him as well. Kern Tr. 83-84, 94 ("He said he had found the accounting errors, and *I assumed* that he was referring to the two accounting errors that had been brought to my attention by Joe and Kelly Ann."). The facts arising in July 2002, which Kern was made aware of at that time, are part and parcel of the claims asserted in Counts I, II, and III of EDR's Counterclaim. Therefore, Kern's contention that there is a causal nexus between his filing of an EEOC Charge in December 2002 and EDR's decision to file counterclaims on March 28, 2003 is disingenuous at best.

      B.      EDR Has A Legitimate Non-Retaliatory Reason For Filing The
                 Counterclaims And Kern Has Not Established Pretext

Moreover, assuming *arguendo*, this Court were to conclude that Kern has established a prima facie case of retaliation, each of EDR's counterclaims are legitimate and were filed for a non-retaliatory reason – to seek legal relief for Kern's misconduct. Kern cannot establish that EDR's counterclaims were filed to retaliate against him for filing an EEOC charge. To the contrary, the undisputed record establishes that Kern knew of the facts giving rise to EDR's counterclaims as early as July 2002 and that EDR had notified Kern in November 2002 that a breach of his non-competition agreements would result in litigation. Accordingly, Kern's claim for retaliation is baseless and should be dismissed as a matter of law.

## CONCLUSION

Because Kern's Complaint fails as a matter of law, EDR is entitled to judgment as a matter of law dismissing his Complaint. Additionally, because Kern has failed to respond to

EDR's counterclaims and the record confirms their validity, EDR respectfully requests that the

Court enter summary judgment for EDR on its counterclaims and schedule a trial on damages.

Furthermore, EDR respectfully requests that the Court award it fees and costs incurred in

defending this action and award such other and further relief as this Court deems just and proper.

    DATED this 1st day of December, 2003.

              Respectfully submitted,

              Morgan, Lewis & Bockius LLP

    By:    *Brian D Buckstein /snp*

        Mark E. Zelek
         Ct. Fed Bar No. ct25203
         Brian D. Buckstein
         Ct. Fed Bar No. ct24543
         bbuckstein@morganlewis.com
         5300 Wachovia Financial Center
         200 South Biscayne Boulevard
         Miami, Florida  33131-2339
         Telephone:   305.415.3303
         Facsimile:   305.415.3001

         Sarah Poston, Esq.
         Ct. Fed Bar No. ct19702
         Zeldes, Needle & Cooper, P.C.
         1000 Lafayette Blvd.
         P.O. Box 1740
         Bridgeport, CT  06601-1740
         Telephone: (203) 333-9441
         Facsimile: (203) 333-1489