UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------------X
CHARLES W. KERN,                           :
                                           :
            Plaintiff,                     :
                                           :     3:03 CV 0233 (AVC)
      -against-                            :
                                           :
ENVIRONMENTAL DATA                         :
RESOURCES, INC.                            :
                                           :
            Defendant.                     :     December 1, 2003
-----------------------------------------------------------X

## LOCAL RULE 56(a)(1) STATEMENT

### Preliminary Statement

Pursuant to Local Civil Rule 56(a)(1) of the United States District Court for the District of Connecticut, Defendant Environmental Data Resources, Incorporated ("Defendant" or "EDR"), respectfully submits this statement of material facts not in dispute.

The following are the undisputed material facts supporting summary judgment for EDR.

### Environmental Data Resources, Inc.

1.  EDR is a national provider of environmental information. Declaration of Robert Barber ("Barber Decl."), at ¶ 3 (attached as Tab 1 to Appendix in Support of Defendant's Motion for Summary Judgment ("Appendix")). Among its numerous products, EDR offers current and historical environmental risk management information, training workshops, and state-of-the-art online services, which include interactive mapping. Id. EDR is incorporated in Delaware and has its headquarters in Southport, Connecticut. Id.

2.  In order to service its clients, EDR has managers and salespersons nationwide, each assigned to specific region(s). Id.

1-M1/507470.2

**Plaintiff's Employment with EDR**

3. On June 23, 1994, EDR's then Vice President of Sales, Brian McCarter ("McCarter"), sent Kern an offer of employment to begin working on July 5, 1994 as the Southern Regional Manager for EDR, at a salary of $37,500 annually. See June 23, 1994 Letter from Brian McCarter to Charles W. Kern (attached as Tab 2 to Appendix); see also Charles W. Kern Deposition Transcript ("Kern Tr.") at 13-14 (attached as Tab 3 to Appendix).

4. Plaintiff accepted this offer of employment. Kern Tr. at 9.

5. Plaintiff was forty years old at the time he was hired. Kern Tr. at 133.

6. Plaintiff's offer of employment stated that it was contingent on his acceptance of a confidential non-compete agreement. See Tab 2 to Appendix.

7. On July 25, 1994, Plaintiff signed a Non-Compete and Confidentiality Agreement ("1994 Agreement"). See July 25, 1994 Non-Compete Agreement (attached as Tab 4 to Appendix); see also Kern Tr. 12

8. The 1994 Agreement provided, inter alia: "Employee hereby agrees that he or she will not for a period of two (2) years from the date of Employee's resignation or termination from the Company, alone or with others, directly or indirectly, own, manage, operate, control, participate in the ownership, management, operation or control of, be employed by, contract with, be an agent of, consult with, advise, assist, aid, associate with or be connected in any other manner with any proprietorship, firm, corporation, partnership, joint venture or other entity engaged in a competing business that engages in the collection manipulation and distribution of government information about hazard/Toxic sites, (the "Company Business"), or solicit (by in-person visits, marketing, promotion, mail or telephone solicitation and/or advertising) any of the Company Business in the United States (the "Non-Competition Territory")." See Tab 4 to Appendix.

9.  As a regional manager, Kern was in charge of sales and marketing for EDR's products. Kern Tr. 17. Plaintiff sold environmental information services and products, such as historical reference information, environmental radius reports, environmental linear reports, environmental corridor reports, environmental area reports, National Environmental Protection Act ("NEPA") reports, city directories, title searches, fire insurance maps, topographic maps, digitized flood maps, and for some time, he also sold aerial photographs. Kern Tr. 17-19, 21.

10. Kern's direct supervisor from 1994 until 2000 was McCarter. Kern Tr. 34-35. At the time of his termination in 2002, Kern's direct supervisor was Joe Burstiner. Kern Tr. 141.

11. Kern was also under the supervision of Joseph T. Freehill ("Freehill"), Regional Vice President of EDR. Kern Tr. 141.

12. During his employment, Kern received a warning concerning his performance. See January 30, 2001 Memorandum from Rob Barber to Charlie Kern (attached as Tab 5 to Appendix).

13. Like most other regional managers, initially Kern sold products for four distinct products within his assigned territory. See Kern Tr. 36. The four products were from four distinct companies: EDR, Sanborn, Strategis Group and Lockwood Mapping. Id.

14. In May 2000, EDR determined that it needed to modify its business structure and its sales and marketing efforts. See Barber Decl. at ¶ 7. Specifically, the business structure was modified with the creation of three separate business units: EDR, The Strategis Group, and the Sanborn Map Company. Barber Decl. at ¶ 7. Previously, sales personnel had been responsible for selling products for each of these companies under the EDR banner. EDR determined that going forward sales personnel would focus their efforts and sell products for only one of the business units. Barber's Decl. at ¶ 7.

Case 3:03-cv-00233-AVC     Document 19-3     Filed 12/01/2003     Page 4 of 17

Case 3:03-cv-00233-AVC    Document 19-3    Filed 12/01/2003    Page 5 of 17

15. After the business reorganization, Kern was offered a new employment relationship with EDR, which he accepted in May 2000. See May 15, 2000 Letter of Employment Offer (attached as Tab 6 to Appendix). Under the new employment relationship, he would sell only EDR products and would focus exclusively on selling environmental information in the State of Florida. Kern Tr. 47.

16. Kern did not request to keep his old market regions or to sell the other products when he accepted the new employment offer. Kern Tr. 47.

17. Accordingly, on May 15, 2000, Kern received a new employment agreement with a covenant not to compete memorializing his new employment relationship with EDR ("2000 Agreement"). Kern Tr. 37-38; see also Tabs 6 and 7 to Appendix.

18. Plaintiff's new employment offer included a salary at an annual rate of $42,333. Kern Tr. 43; see also Tab 6 to Appendix. Kern signed the non-compete confidentiality agreement attached to that letter on May 17, 2000. Kern Tr. 39-40; May 17, 2000 Non-Compete Agreement (attached as Tab 7 to Appendix).

19. Kern is not aware of whether other employees or managers were also asked to sign new employment agreements. See Kern Tr. 38.

20. The 2000 Agreement provided, inter alia: "Employee hereby agrees that for a period of one (1) year from the date of Employee's resignation or termination from the Company, he or she shall not: (a) alone or with others, directly or indirectly, own, manage, operate, control, participate in the ownership, management, operation or control of, be employed by, contract with, be an agent of, consult with, advise, assist, aid, associate with or be connected in any other manner with any proprietorship, firm, corporation, partnership, joint venture or other entity that: (i) engaged in the collection, development, packaging, and sale or licensing of

historical, governmental, geographical, environmental, telecommunications data and information, and informational products or services relating to real estate and/or telecommunications industry (the "Company Business"); or (ii) solicit (by in-person visits, marketing, promotion, mail or telephone solicitation and/or advertising) any of the Company Business in the United States (the "Non-Competition Territory")." See Tab 7 to Appendix.

### EDR's Expense Report Policy

21. EDR's Expense Report Policy ("Expense Policy") provides that employees will be reimbursed for all "reasonable expenses incurred while traveling on authorized company business." Memorandum re: Expense Report Policy, May 2, 2002, at 1 (attached as Tab 8 to Appendix); see also EDR Travel & Entertainment Expense Policy, February 2001 at 1 (attached as Tab 9 to Appendix); Kern Tr. 99.

22. Pursuant to this policy, on a weekly basis, Kern, as well as all other regional managers, was required to submit a Report of Business Expenses wherein he would enter his travel expenses to obtain reimbursements from by EDR. Kern Tr. 49-50. Kern was reimbursed for business miles on his automobile at a rate of thirty-six cents ($.36) per mile. Kern Tr. 50.

23. Regarding meals, EDR's policy specifically states that employees will be reimbursed "for all REASONABLE meals while on company time only." See Tab 8 and 9. (emphasis in original).

### Kern's Fraudulent Reports of Business Expenses

24. On June 26, 2002, Kellyann Barberio ("Barberio") discovered that Kern had submitted a bill for reimbursement twice. See Barber Decl. at ¶ 11. Specifically, Kern submitted an original DSL charge with his June 1, 2002 expense report and then submitted a photocopy of the same bill with his June 15 expense report. Id.

25.  As a result of this occurrence, EDR conducted an investigation into Kern's previously submitted expense reports. See Barber Decl. at ¶ 12. Through the investigation it was discovered that Kern had engaged in wide-ranging and repeated acts of expense reimbursement fraud. See Barber Decl. at ¶ 13. For example, Kern submitted a phone bill for reimbursement with his June 29, 2002 report. Id. However, Kern had previously submitted the very same bill twice before (on March 1 and April 18). Id. Similarly, Kern twice submitted the identical $49.99 internet charge for reimbursement (June 1 and June 15) and twice submitted the same $44.57 phone bill for reimbursement (June 15 and June 29). Id.

26.  Kern submitted receipts for meals he had at restaurants within ten miles of his home *after* he had concluded his work for the day as business expenses. See Reports of Business Expenses and Copies of Submitted Receipts (attached as Tab 10-13 to Appendix).

27.  For the week ending April 20, 2002, Kern traveled to see clients in Miami, Boca Raton, Pompano and Fort Lauderdale, Florida. Kern Tr. 49-50. That week, Kern submitted a receipt for a meal reimbursement each day. Report of Business Expenses and Copies of Submitted Receipts for the week ending no April 20, 2002 (attached as Tab 10 to Appendix). On April 16, 2002, Kern submitted a receipt for a $18.52 **lunch** , signed at **8:26 p.m.**, from a Ruby Tuesday restaurant about **2 miles from his house**. Kern Tr. 51-52; see also Tab 10 to Appendix. For April 18, 2002, Kern traveled to Fort Lauderdale, Florida. He entered a total of 80 miles for the round trip from Coconut Creek to Fort Lauderdale and submitted a receipt for $13.52, signed at 3:05 p.m. from a restaurant, Gotrocks II, which is located in Coconut Creek. Kern Tr. 53-54.

28.  For the week ending April 27, 2002, Kern's submitted a Report of Business Expenses that indicated that he had traveled to Fort Lauderdale, Hollywood, Boca Raton and Miami, Florida. Report of Business Expenses and Copies of Submitted Receipts for the week

ending no April 27, 2002 (attached as Tab 11 to Appendix). For April 23, 2002, on which date he traveled to Boca Raton, Kern submitted a receipt for a $18.52 **lunch**, signed at **7:04 p.m.**, from the Ruby Tuesday restaurant about **2 miles from his house** in Coconut Creek. Kern Tr. 56-57.

29. For the week ending May 18, 2002, Kern submitted a Report of Business Expenses indicating that he had traveled to Fort Lauderdale, Delray, Hollywood, Winter Park and West Palm Beach. See Report of Business Expenses and Copies of Submitted Receipts for the week ending no May 18, 2002 (attached as Tab 12 to Appendix). On May 15, 2002, he traveled to Hollywood. See Tab 12 to Appendix. For that day, Kern submitted a receipt for a $17.82 **lunch**, signed at **6:18 p.m.**, from a restaurant called Tokyo Delight, which is about **5 miles from his house** in Coconut Creek.

30. On his Report for Business Expenses for the week ending May 18, 2002, Kern also reported an expense of $495 and attached a receipt for a registration to a Tower and Site Management Conference. See Tab 12 to Appendix. The form indicates that the individual rate per person was $150.00 while the group rate "four or more people from same company," was $495.00. See Tab 12 to Appendix. Even though Kern went by himself to this conference, he made an unnecessary and inexplicable expense of $495.00 for the group rate, charged it to his personal credit card, obtained additional points on his credit card, and then asked for reimbursement from EDR. Kern Tr. 65-66.

31. For the week ending May 25, 2002, Kern reported that he had traveled to Boca Raton, Orlando and Miami. See Report of Business Expenses and Copies of Submitted Receipts for the week ending May 25, 2002 (attached as Tab 13 to Appendix). For May 22, 2002, he went to Orlando and came back home to Coconut Creek that same day. Kern Tr. 67-68. **After**

**he arrived back home**, he had a meal at Tokyo Delight, the restaurant near his house in Coconut Creek, at **6:33 p.m.** Id. The next day he went to Miami, and once he returned home, he had a $19.97 meal at around 2 p.m. at a restaurant called the Whale's Rib, less than ten miles away from his house. Kern Tr. 69-71.

### Plaintiff's Termination

32. On July 9, 2002, Barberio sent Plaintiff an email, informing him of the fraudulent submission of for reimbursements that had been uncovered. See Barber Decl. at ¶ 12. Mr. Barber was copied on the email and, concerned by the issues raised by the e-mail, immediately investigated the matter. See Barber Decl. at ¶ 12. The results of his investigation were that on numerous occasions Kern had submitted fraudulent reports asking for reimbursements for expenses that he was not entitled to. Barber Decl. at ¶ 123.

33. On July 10, 2002, Plaintiff had a conversation with Barber where he was informed about the fraudulent submissions of his cellular phone bill. Kern Tr. 83-84. Mr. Barber explained to Kern that EDR was terminating him from his employment with EDR. Kern Depo. at 84. The next day, EDR sent Kern a termination letter. See July 11, 2002 Letter from Robert D. Barber to Charles W. Kern (attached as Tab 14 to Appendix).

### Kern's Claim for Unpaid Wages

34. Kern's claim for unpaid wages is based on vacation days he claims he was entitle under the May 15, 2000 Second Non-Compete Agreement he entered into with EDR. Kern Tr. 96-97.

35. Kern specifically makes a reference to the vacation he did not take in his many years at the company as grounds for his unpaid wages claim. Kern Tr. 98. The agreement entered into between Kern and EDR on May 15, 2000, states that "[a]ll vacation and paid

holidays must be used in the twelve month period in which they accrue." Letter of May 15, 2000 from Joseph Freehill to Charles Kern at 1; see also Kern Tr. 98.

36.     When Kern's employment with EDR was terminated in July 2002, he had seven (7) unused holiday and vacation days and EDR paid Kern for these seven days of accrued and unused vacation. Barber Decl. at ¶ 21. He received a check from EDR for the accrued vacation pay subsequent to his termination. Kern Tr. 99.

### Plaintiff's Actions Following his Termination

37.     After his termination from EDR, Kern incorporated a company in Florida called "Environmental Reports, Inc." ("ERI"). Kern Tr. 105. ERI's only employee is Kern and it maintains its principal place of business at 3540 N.W. 71st St., Coconut Creek, Florida, which is Kern's home address. Id.

38.     About thirty days after he was terminated from EDR, Kern contacted Edward "Tad" Mickler ("Mickler") at Environmental First Search ("First Search"), seeking job opportunities. Kern Tr. 100, 102, 104, 117.

39.     First Search is a direct competitor of EDR. Kern Tr. 102, 104.

40.     At the time that Kern was seeking new employment opportunities, he was aware of the fact that he had an operative non-compete agreement with EDR. Kern Tr. 102-103.

41.     Nevertheless, on October 25, 2002, ERI entered into an independent contractor agreement with First Search whereby Kern would act as a sales representative for First Search and sell environmental information services, historical reference information, radius, linear, corridor, area and NEPA reports, all products he had sold as an employee of EDR. Kern Tr. 102, 105-107. See also October 25, 2002 Independent Contractor agreement between First Search and ERI (attached as Tab 15 to Appendix)

42. The agreement entered into between ERI and First Search was for no specific period of time and it could be terminated by First Search at any time. Kern Tr. 118.

43. Incorporated into this agreement was a list of seventeen (17) National Accounts that were currently and actively doing business with First Search. November 1, 2002 Independent Contractor Agreement at 4, Ex. "B."

44. Some of the clients whose accounts Kern would solicit as part of his new agreement with First Search had operations in Florida, such as ATC, MacTec, PSI and Terracon. Kern Tr. 107-108.

45. Kern had dealt with these clients while he was employed with EDR. Kern Tr. 109, 116.

46. As a result of his previous contact with these clients at EDR, Kern had gained an understanding of what the necessities and interests of each individual company were in terms of the pricing they were accustomed to pay and the demands they each had for each particular product. Kern Tr. 110-113.

47. After he began working for First Search, Kern would communicate with these companies claiming he would be able to offer them lower prices than what they were paying. Kern Tr. 114.

### EDR Discovers Kern's Breach of His Non-Compete Agreement

48. Upon finding out that Kern might be an agent of First Search, *and prior to his filing of an EEOC charge against EDR*, Mr. Barber wrote Kern a letter on November 25, 2002, indicating that he had a continuing legal obligation under his Non-Compete Agreements and that becoming an agent for First Search would raise questions regarding his compliance with such obligations. Barber Decl. at ¶ 17 See also November 25, 2002 Letter from Robert Barber to Charles W. Kern (attached as Tab 16 to Appendix)

1-MI/507470.2                                10

49.   On November 25, 2002, Mr. Barber also wrote a letter to Mickler at First Search informing him about Kern's contractual, legal and ethical obligations towards EDR. <u>See</u> November 25, 2002 Letter from Robert Barber to Edward Minkler (attached as Tab 17 to Appendix).

50.   On January 13, 2003, Kern received a letter from First Search terminating their contractual relationship. Kern Tr. 119.

51.   First Search terminated its relationship with Kern because it did not want to continue disbursing the monthly retainer and travel reimbursements they were paying Kern. <u>See</u> January 13, 2003 Letter from Edward Mickler to Charles Kern (attached as Tab 18 to Appendix). <u>See</u> also Kern Tr. 119.

52.   First Search's letter to Kern stated that the contractual relationship was terminated for these reasons. <u>See</u> Tab 18 to Appendix.

53.   After First Search terminated its contractual relationship with Kern, he continued to work as an agent for First Search. Kern Tr. 120.

54.   Since July 12, 2003, Kern has contacted Florida clients who are customers of EDR, such as Nutting, E-Pack, ECT, URS, Qore, Enviro Design, EE&G, ATC, MacTec, and Ardaman. Kern Tr. 124-125. When contacting these companies, Kern has been recognized as a former EDR managerial employee. Kern Tr. 126.

### **Kern's Age Discrimination Claim**

55.   Kern testified at his deposition that he was told by a former colleague at EDR, Allyson Dussault, that she had errors in her business expense reports in the past. Kern Tr. 132.

56.   Kern does not know for a fact that Dusault submitted phone bills or any other requests for reimbursement more than once, as he did. Kern Tr. 133.

57. Mr. Barber had no knowledge of Allyson Dussault, or any other employee of EDR, engaging in the type of conduct engaged in by Kern. See Barber Decl. 14.

58. Kern is aware that other people under the age of forty (40), have been terminated by Mr. Barber. Kern Tr. 133-134.

### Kern's Retaliation Claims

59. EDR identified the factual predicates to its counterclaims before Kern filed his charge with the EEOC, while EDR was trying to negotiate a separation agreement. See Kern Tr. 138.

60. On November 25, 2002, *one month before Kern filed his Charge with the EEOC*, EDR sent Kern a letter apprising him of its concern that he was acting in violation of his non-compete agreements. See Appendix Tab 16.

### EDR'S Counterclaims

61. Kern has not answered EDR's counterclaims. See Docket.

Case 3:03-cv-00233-AVC    Document 19-3    Filed 12/01/2003    Page 15 of 17

DATED this 1st day of December, 2003.

        Respectfully submitted,

        Morgan, Lewis & Bockius LLP

        By: *Brian D. Buckstein /snp*
        Brian D. Buckstein
        Ct. Fed Bar No. ct24543
        bbuckstein@morganlewis.com
        5300 Wachovia Financial Center
        200 South Biscayne Boulevard
        Miami, Florida 33131-2339
        Telephone: 305.415.3303
        Facsimile:  305.415.3001

        Sarah W. Poston, Esq.
        Ct. Fed Bar No. ct19702
        Zeldes, Needle & Cooper, P.C.
        1000 Lafayette Blvd.
        P.O. Box 1740
        Bridgeport, CT  06601-1740
        Telephone: (203) 333-9441
        Facsimile:  (203) 333-1489

## CERTIFICATE OF SERVICE

I certify that the foregoing has been furnished to counsel for Plaintiff, Thomas W. Bucci, Esq., Willinger, Willinger & Bucci, P.C., 855 Main Street, Bridgeport, CT 06604 by U.S. mail this 1st day of December, 2003.

*Sarah W. Poston*
Sarah W. Poston