**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHARLES W. KERN, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:03cv0233(AVC) |
| VS. | : | |
| | : | |
| ENVIRONMENTAL DATA | : | |
| RESOURCES, INC., | : | |
| Defendant. | : | JANUARY 21, 2004 |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I.       *Background*

The plaintiff brings this action against the defendant alleging various causes of action arising from the termination of his employment with the defendant.  The plaintiff was terminated by the defendant on July 11, 2002.  At the time of his termination, the plaintiff was employed by the defendant as its Regional Manager for the state of Florida.  The defendant was in the business of marketing and selling environmental data.  It had established a national network of sales people to market and sell its products.  The defendant, who had employed the plaintiff since 1994, offered the plaintiff this particular position in a letter dated May 15, 2000, which the plaintiff accepted.  (Discovery Response Exhibit 4).  The plaintiff assumed his new title on June 1, 2000.  The appointment of the plaintiff to the position of Regional Manager for the state of Florida resulted in the plaintiff receiving a reduction in salary.  (Kern Tr. 41).

Prior to working for the defendant as its Regional Manager for the state of Florida, the plaintiff worked for the defendant as its Southeastern Regional Manager.  He was hired to that

position in June of 1994 when he accepted the defendant's offer extended to him by the

defendant in a letter dated June 23, 1994.  (Discovery Response Exhibit 1).  The plaintiff's

employment with the defendant was continuous from his start date of July 5, 1994, to the date of

his termination on July 11, 2002.

As a condition of his original employment, the defendant required that the plaintiff sign its

"standard confidentiality/non-compete agreement."  "EDR has a standard employee

confidentiality/non-compete agreement.  This offer of employment is contingent upon your

acceptance of this agreement."  (Discovery Response Exhibit 1).  Although the position offer

made to the plaintiff in the May 15, 2000 letter did not contain similar conditioning language, the

defendant, nevertheless, required the plaintiff to execute a new employee non-

compete/confidentiality agreement.  (Discovery Response Exhibit 4).  The plaintiff executed the

non-compete/confidentiality agreement because he did not want to lose his job.  (Kern Tr. 41).

From January 23, 1994, to the date of his termination, the plaintiff performed his job duties

in a most successful manner.  He was the recipient of noteworthy praise[1] on numerous occasions

by his supervisors at EDR.  His very appointment to the Regional Manager's position for the

state of Florida speaks to his success.  On January 23, 2000, the plaintiff was singled out for

praise by Brian McCarter, the defendant's vice president for sales.  "Congrats to CWK for taking

home the big daddy with an extension of his SDS (Maricopa, AZ) Project.  After our meeting in

_____

[1] The defendant refers to one instance in the plaintiff's eight-year employment history where he was provided written goals in a memo dated January 30, 2001, where the defendant warned the plaintiff if he did not meet the goals his employment would be terminated on March 30, 2001.  The defendant fails to mention that the plaintiff not only met the stated goals but far exceeded them.  His employment continued in a very successful manner up to the date of his termination on July 11, 2002.  During that period of time, the plaintiff became one of the top performers for the defendant.

TN yesterday, SDS has asked us to extend our original scope of tax parcel work for them...A record has been set folks. Nice job developing that relationship Charlie, SDS has become an excellent partner with us." (Discovery Response Exhibit 3). Similarly, on May 3, 2001, the plaintiff was commended by his supervisor in the most glowing of terms, "never was I more proud for you (Kern) than I was today. It was a classic moment. We were talking about the South Water FL District Everglades project with Rick Pearse. AJB and AMD were also with me. I brought up how you are on top of that project and Rick states - 'Charlie is a great guy. My guys down there love him. IT WAS BECAUSE OF CHARLIE THAT THE ENTIRE EDR/LAW PARTNERSHIP EXISTS!!!!! If it wasn't for him this whole arrangement would never of happened'. I thought you ought to know. Thanks again for all of your hard work." (Discovery Response Exhibit 6). Burstiner followed up with the May 3, 2001 communication with an email to other company officials, "Rick also credited CWK with being one of the integral factors of bringing in the entire LAW account..." (Discovery Response Exhibit 7). By July 6, 2001, even Rob Barber, the author of the January 30, 2001 "warning" memo, had to admit that the plaintiff's performance was exceptional, "Great job in getting FL region turned around over the past 5 months. You've exceeded 90% in 4 of these months and have gotten the region up to 86% YTD. *Super work!* I'm looking forward to seeing FL above a 100% as we enter FY02. Congrats on the turn around." (Discovery Response Exhibit 8) (Emphasis added). The Chief Executive Officer for the defendant likewise joined in the recognition of the plaintiff's superb job performance by noting on August 14, 2001, "great work Charlie!" (Discovery Response Exhibit 9). And again, on August 15, 2001, the same Rob Barber referring to the

plaintiff's work efforts, expressed the defendant's appreciation for the plaintiff's work efforts, "Good work"; a simple but meaningful phrase when viewing the defendant's belated efforts to rewrite the plaintiff's employment record. (Discovery Response Exhibit 10).

The plaintiff's superior job performance is recorded in the defendant's budget records. In October of 2001, the plaintiff exceeded budget, showing a record of 109% against budget for that month, placing him, performance wise, 4th out of 19 among his peers. (Discovery Response Exhibit 13). The results for year to date as of November 15, 2002 demonstrated similar results; the plaintiff was performing at 110% against budget, placing him 3rd among his 19 peers. The plaintiff's performance brought forth another commendation from Rob Barber, "Great job, Charlie. Recall last year FL only grew by 1%. Looks like things are heating up so far in 02. Keep up the good work, especially getting those FS clients to convert." (Discovery Response Exhibit 14). "Given the 'flat budget scenario' we have this year, the 6 people over 100% have, so far, done a *tremendous* job in growing revenue and should be recognized for their great performance so far this year. Congratulations to ...Charlie..." (Discovery Response Exhibit 14) (Emphasis added). And on December 16, 2001, the plaintiff was notified by Rob Barber that his name would go on the President Club plaque for the fiscal year 2000, "i ordered a large president's club plaque to hang in the front reception area. 1 plaque for fy00 and another for fy01. your names will be on it so make sure to check out next time you're in southport..." (Discovery Response Exhibit 16).

The recognition given by the defendant to the plaintiff's superior job performance continued into 2002. The results of his performance review elicited the following commentary between the

4

plaintiff and his superior; Kern states in an email dated January 18, 2002, "Thanks for the review

Joe.  I believe I will have a beer at the Whale's Rib..."  His superior responds, "A 'Well

Deserved Beer!!"  (Discovery Response Exhibit 17).  The plaintiff's performance review

confirmed the plaintiff's excellent accomplishments.  The plaintiff was ranked "4th out of 15

RM's (GREAT WORK)"; his potential rating -HIGH Vital 70%; and his overall rating - High

Vital 70%.  (Discovery Response Exhibit 18).  Commenting on the plaintiff's performance

review, the plaintiff's supervisor acknowledged, "Great work CWK.  Keep it rolling!!"

(Discovery Response Exhibit 18).  And the plaintiff did keep it rolling.  For the month of

January, 2002, the plaintiff continued to rank 4th among his peers.  (Discovery Response Exhibit

14).  And his year to date performance measured on February 5, 2002, showed he was

performing ahead of budget at a rate of 103% against budget  (Discovery Response Exhibit 20);

bringing forth additional praise for his job performance, "Special recognition to QUA and CWK

for turning around regions that had been performing poorly.  Again, great examples that hard

work and high activity gets the job done."  (Discovery Response Exhibit 20).  March, April and

May, 2002 generated even more recognition for the plaintiff's work results.  (Discovery

Response Exhibits 21-24).  In particular, the plaintiff's job performance review evidences the

high regard the defendant viewed the plaintiff in April of 2002; the plaintiff was ranked in the

highest category for objective performance and subjective potential performance.  (Discovery

Response Exhibit 23).

    Without any negative evidence in the plaintiff's work record, and the objective evidence

overwhelmingly demonstrating a superb employment history, the defendant, nevertheless, in

describing the plaintiff's job performance in a communication to the United States Equal

Employment Opportunity Commission, inexplicably asserted the plaintiff's work performance

after being warned in writing on January 30, 2001 improved to "adequate at best".  (Discovery

Response Exhibit 63).

As far back as 1999, the defendant experienced difficulty with its expense reimbursement

procedures.  Errors were being made despite efforts to improve the process.  "Everyone should

have received a copy of the new expense report format, the copy of this is enclosed.  I have had a

problem in the past with receiving the expense reports correctly, on many occasion (sic) I have

stated the procedure on naming and attaching expense reports and to this date the procedure is

still not being followed.  *As of June 18th expense reports that are incorrect will be sent back,* this

including emails as well as the hard copies.  Please take the time and do it right the first time any

errors delay your reimbursement."  (Discovery Response Exhibit 2).  In February 2001, the

defendant formalized its expense reimbursement policy.  It authored a document entitled "EDR

Travel & Entertainment Expense Policy".  The purpose behind the policy was "to establish

reasonable and consistent travel and entertainment expense standards for EDR employees."

(Defendant's Tab 9)  The policy provided, "EDR will reimburse employees for all

REASONABLE meals while on company travel."  It is expected that employees will use the

following guide to budget meal expenses:  Breakfast $15.00, Lunch $20.00, Dinner $30.00

maximums...EDR will reimburse a maximum of $125.00 per month for the use of mobile

phones...EDR will reimburse regional managers a maximum of $25.00 per month for internet

service provider expenses...EDR will reimburse regional managers a maximum of $50.00 per

month for DSL service...EDR encourages employees to phone home while traveling on company business and considers this a normal business expense...*Individuals authorized to approve travel, entertainment and related expenses are personally responsible for the administration of this policy*..." (Defendant's Tab 9) (Emphasis added).

The defendant, thereafter, by memo dated May 2, 2002, promulgated yet another set of policies regarding expense reimbursement. (Discovery Response Exhibit 25). "THE following statement has been prepared in order to establish reasonable and consistent travel and entertainment expense standards for EDR employees...It is the policy of EDR to reimburse employees for all reasonable expenses incurred while traveling on authorized company business...Employees are also expected to use common sense and moderation when traveling or entertaining on company business. Extravagance is not authorized and *will not be approved*...EDR will reimburse for all REASONABLE meals while on company time **only**...[Telephone and Cellular phone] bills must be attached to your expense report and noted properly...Limits based on manager's approval...[Internet access] bills must be attached to your expense reports...Limits based on department manager's approval..." (Discovery Response Exhibit 25).

On July 9, 2002, the plaintiff received a communication from K. Barberio explaining errors made by the plaintiff on his expense reports. The errors included the plaintiff submission of the same phone bill in the amount of $38.15 for reimbursement on three separate occasions, the submission of a phone bill in the amount of $24.02 two different times, and the expensing of his cellular telephone. Barberio informed the plaintiff "I'm sure these were simply oversights on

7

your part."  She then made suggestions to the plaintiff that would assist him in preventing future errors.  (Discovery Response Exhibit 36).  The plaintiff immediately responded to Barberio, apologizing for the inconvenience he had caused her as well as for the errors he had made; he forwarded to her certain information she had requested.  (Discovery Response Exhibit 36).  Barberio responded to the plaintiff by stating, "THANKS MUCH!"  (Discovery Response Exhibit 36).

On July 9, 2002 the plaintiff's supervisor informed the plaintiff with regard to the expense report errors, he would "have to be more careful", and as to the cellular phone reimbursement, the limit was $125.00.  A final communication between the plaintiff and his supervisor ended with the plaintiff expressing his gratitude for his supervisor's assistance, which elicited the comment from his supervisor, "no problem".  (Discovery Response Exhibit 35).

On July 11, 2002, the first day of a short planned vacation, Barber telephoned the plaintiff and informed him that as a result of the two errors that the plaintiff made on his expense reports, he was being terminated.  "Mr. Barber called me on my cell phone in a - - and told me that - - about the two mistakes that I had made and thought it would be time to terminate my employment at EDR, of which I was completely shocked, because I had - - I was in the midst of my best month in one of the best years, as far as performance...I - - I didn't think it was true at first.  I thought it was a joke.  You know, I thought it was a simple clerical mistake..."  (Kern Tr. 84)  The only reason Barber provided the plaintiff for firing the plaintiff was that he had submitted the two phone bills identified by Barberio in her email to the plaintiff.  (Discovery Response Exhibit 36).  Although the defendant now asserts that Barber conducted an "audit" of

the plaintiff's expense reports, he never mentioned this to the plaintiff when he fired the plaintiff. The plaintiff had never been told that his requests for reimbursement for his lunches were also a cause for his termination.  Barber never referred, either in his phone conversation with the plaintiff or in his letter to the plaintiff terminating the plaintiff's employment, to any "audit" of the plaintiff's expense reimbursements.  The defendant does not point to any written records or documents in which the defendant asserted that the reason for the plaintiff's termination was his fraudulent behavior.  Likewise, the defendant does not reference any records indicating that Barber had performed an audit of the plaintiff's expense reports.  The defendant is unable to point to any communication it made to the plaintiff or to anyone else that the plaintiff was being fired because his expense reports relating to his meal reimbursements were considered fraudulent.

Although the defendant broadly labels the plaintiff's conduct as fraudulent, the defendant is unable to demonstrate any such activity.  The plaintiff did not alter the records or falsify the receipts he submitted with his expense reports.  The receipts the plaintiff submitted were completely accurate, without any attempt made by the plaintiff to conceal or change any information on them regarding either the time, place or amount.  The plaintiff turned over to the defendant completely accurate records.  The receipts submitted detail the exact time of day the meal was taken, the place it was taken and the amount incurred.  In addition, the expense reports themselves do not contain any falsified information; the reports are completely accurate.  And these records were submitted by the plaintiff to his supervisor and the defendant's accounting department for review and approval.  Nothing was concealed, obscured, altered or

misrepresented.  Despite the defendant's baseless claim to the contrary, there was nothing fraudulent in the plaintiff's submission of his expense reports.

Over an eight-year period of time through the date of the plaintiff's termination, the plaintiff's supervisor and the defendant's accounting department never questioned the propriety of the plaintiff's submission of expense reports seeking reimbursement for lunches consumed at the end of the plaintiff's workday.  (Kern Tr. 55, 58, 72, 145).  In the February 2002 policy, the defendant asserted that [*i*]*ndividuals authorized to approve travel, entertainment and related expenses are personally responsible for the administration of this policy*..."  (Defendant's Tab 9) (Emphasis added).  Each expense report submitted to the defendant by the plaintiff had the approval of his supervisor and the defendant's accounting department.  As such, the plaintiff had every reason to believe that working through his lunches, and eating at the end of his workday, met the requirements of the defendant's policy.

As previously noted, when Barber first notified the plaintiff of his firing, Barber relied on the two erroneous phone bill submissions as the basis for the plaintiff's termination.  After speaking to the plaintiff, Barber wrote the plaintiff a letter dated July 11, 2002, in which he stated, "I regret to inform you that your employment at EDR has been terminated effective immediately." (Discovery Response Exhibit 40)  The letter is not only devoid of any mention of fraudulent behavior on the plaintiff's part, it is devoid of any reason, what so ever, for the plaintiff's termination.  As of the present date, the defendant has not recorded in a company record why it fired the plaintiff.  When the plaintiff applied for unemployment compensation, the reason for plaintiff's termination was given as "The claimant was discharged for allegedly making a false

10

statement on work related documents.  No information has been submitted which substantiates misconduct."  (Discovery Response Exhibit 60).  In a letter sent to the plaintiff on August 9, 2002, shortly after the plaintiff's termination and after the completion of the alleged audit conducted by Barber regarding the plaintiff's expense reports, Barber makes no mention of the supposed widespread fraud he had discovered.  In the letter, reacting to the plaintiff's threat to bring suit against the defendant, Barber responds with his own threat, "in the event you choose litigation, EDR will counterclaim for all amounts owed to EDR as a result of the expense reports submitted in duplicate."  (Discovery Response Exhibit 44).  Meaningful by its absence is any mention regarding the alleged widespread fraud, in particular, the meal reimbursements submitted by the plaintiff.  In another memo to the plaintiff on August 29, 2002, Barber again fails to mention the widespread fraud he had supposedly discovered.  (Discovery Response Exhibit 47).  In truth, the defendant cannot point to any correspondence with the plaintiff where it even hinted that it considered his behavior fraudulent.  Additionally, until the plaintiff initiated this lawsuit, the defendant never pursued a claim against the plaintiff, whether through court or a criminal justice agency, in which it charged the plaintiff with widespread fraudulent activities.

The defendant implies that the plaintiff believed that he was entitled to a "free lunch" on the company for every day he worked.  This is simply the defendant's effort to divert attention from the illegitimacy of the reasons it has concocted to justify its termination of the plaintiff's employment.  A review of the expense reports submitted by the defendant in support of its motion for summary judgment shows quite clearly that there were days that the plaintiff did not seek reimbursement for his meals.  (Kern Tr. 142-144).  The plaintiff sought reimbursement for

11

meals only pursuant to company policy, when he was traveling on company business.  The plaintiff was a leading sales person for the defendant and, as a result, traveling was a job necessity.  As Barber stated to the "EDR Sales Team" in an email dated July 8, 2002, "...Remember in our business we've always said there are 3 critical areas we control and 1 that we don't control.  The areas we control are: 1. our activity levels: how hard we work (calls and visits)..." (Discovery Response Exhibit 34).  Calls and visits, most certainly, means travel, and travel means eating on the road.

The plaintiff filed a charge of employment discrimination with the United States Equal Employment Opportunity Commission December 19, 2002.  On March 10, 2003, the defendant, for the very first time, made the outrageous and baseless claim that the plaintiff "engaged in wide-ranging and repeated acts of expense reimbursement fraud." (Discovery Response Exhibit 63).  Even as of that date, the defendant did not pursue its claim of expense reimbursement fraud in any forum.  In responding to the defendant's baseless accusation, the plaintiff informed the EEOC that for over seven years he had turned in a fifty percent on most of his hotel bills because of a discount travel arrangement that he had paid for himself.  This discount alone saved the defendant thousands of dollars.  "I have documentation that also shows that for 7+ years I turned in a 50% discount on most of my hotel bills because of a discount travel arrangement that I paid for myself.  This discount alone save (sic) EDR thousands of dollars." (Discovery Response Exhibit 64).

When the plaintiff was fired, the defendant did not pay him the vacation and sick pay that he had accrued and to which he was entitled on employment separation.  When the plaintiff

requested payment from the defendant, Barber made payment conditional on the plaintiff signing

a separation agreement in which he would release the defendant from all claims.  (Discovery

Response Exhibit 44 and Exhibit 47).  It was only after the plaintiff initiated this action did the

defendant make any attempt to pay the plaintiff the monies owed to him.  The monies were sent

to the plaintiff on February 24, 2003, over seven months after the plaintiff was fired.  The

amount sent to the plaintiff was $902.31, much less than that owed the plaintiff.  The defendant

compensated the plaintiff for "seven accrued and unused vacation/holidays", because "[w]hen

Mr. Kern was discharged on July 11, 2002, he had accrued 58% of his vacation/holiday time, or

11 days, and had used four days.  (Exhibit 101 - Letter from Buckstein to Bucci).  However, the

plaintiff was entitled to pay for his entire vacation and floating holidays, nineteen days.  Kern Tr.

96-99.  Pursuant to the policy of the defendant, vacation and floating holidays accrued in full on

the first day of January of each year.  (Kern Tr. 96-99).  The plaintiff at the time of his

termination had not used any vacation days.  Additionally, vacation and holiday reimbursement

were to be compensated not on the basis of base salary alone; vacation pay was based on salary

plus commission.  In calculating the plaintiff's reimbursement, the defendant wrongfully based it

on straight salary.

    After he was fired the plaintiff sought various job opportunities.  Since he had made a career

in the environmental information industry, he sought employment in that field.  However,

recognizing that he had been required to sign a non-compete agreement when he accepted the

defendant's offer of employment on May 15, 2000, which encompassed the entire United States,

the plaintiff restricted himself to opportunities outside of Florida, which had been the exclusive

location of his work efforts since June of 2000.  (Kern Tr. 102, 103) (Discovery Response

Exhibit 4).  Being out of work, the plaintiff formed a company called Environmental Reports,

Inc. to pursue income-producing endeavors in the environmental data business.  The plaintiff

executed an "Independent Contractor Agreement" with a company by the name of FirstSearch

Technology Corporation on November 1, 2002, admittedly a competitor of the defendant.

(Discovery Response Exhibit 49).  Under the agreement, the plaintiff assented to "represent and

provide Company's services to Company's national clients".  Because of the non-compete

agreement, which the plaintiff was made to sign in 2000 with the defendant, the plaintiff

voluntarily excluded FirstSearch's Florida clients from the purview of his sales efforts.  (Kern

Tr. 102, 103).

    In spite of the plaintiff's efforts to exclude the Florida territory from the services he would

provide FirstSearch, the defendant insisted on the enforcement of the non-compete agreement

over its full national scope.  In simultaneous letters sent to the plaintiff and FirstSearch on

November 25, 2002, the defendant threatened litigation to enforce the terms of the non-compete

agreement.  (Discovery Response Exhibit 50 and Exhibit 51).  In the letter to the plaintiff the

defendant warned the plaintiff "[w]e would consider any employment with First Search

Technology ("First Search") to be a breach of your Non-Compete/Confidentiality Agreement..."

(Discovery Response Exhibit 51).  Likewise, the defendant informed the FirstSearch by email

dated December 4, 2002, "Mr. Kern's efforts to sell or 'promote' the Environmental FirstSearch

product is in direct violation of his Agreement."  (Discovery Response Exhibit 54).  On January

13, 2003, FirstSearch terminated the Independent Contractor Agreement into which it had

entered with the plaintiff, "please use this letter as official notification that we are terminating this agreement..." (Discovery Response Exhibit 55).

The plaintiff brought the present action against the defendant charging the defendant with discriminating against him on account of his age; violating the Connecticut Wage and Hour Law; breaching his employment agreement with regard to the payment upon termination of his accrued vacation and sick time; tortuous interference with his agreement with FirstSearch; attempting to enforce an invalid non-compete agreement ; and unlawful retaliation under the Age Discrimination In Employment Act by filing claims of widespread fraud against the plaintiff in the present action in retaliation for the plaintiff charging the defendant with age discrimination.

## II.    Discussion

### a.    Standard for Deciding Motion for Summary Judgment

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  See *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2d Cir. 1995); *Chambers v. TRM Centers Corp.*, 43 F.3d 29, 36 (2d Cir. 1994); *Stern v. Trustees of Columbia University in City of New York*, 131 F.3d 305 (2d Cir. 1997).  ("It is of course well established that a motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed.R.Civ.P. 56(c).  In assessing the record to determine whether there is such an issue, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of

the party against whom summary judgment is sought. . .")  A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See *Doe v. Dept. of  Public Safety*, 271 F.3d 38, 47 (2d Cir. (2d Cir. 2001) (Internal citations and quotations omitted). "Summary judgment is inappropriate unless 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c).  On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them . . . In deciding such a motion, we, . . . must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. . . Conclusory allegations, conjecture, and speculation, however, are insufficient to create a genuine issue of fact. . .  Furthermore, in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment . . ." *Kerzer v. Kingley Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998).  In deciding a motion for summary judgment, the court cannot try issues of fact, but can only determine whether there are issues of fact to be tried.  *Kerzer v. Kingley Mfg.,* supra at p. 400; *Cronin v. Aetna Life Insurance Co.,* supra at p. 203.  If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference can be drawn in

favor of the non-moving party, summary judgment is improper.  *Chambers v. TRM Copy Centers Corp.,* supra at p. 37; *Lafond v. General Physics Services Corp.,* 50 F.3d 165, 171 (2d Cir. 1995). The trial court's function at this stage is to identify issues to be tried, not decide them.  *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir. 2000).

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F. 2d 54, 58 (2d Cir. 1987); *Heyman v. Commerce & Indus. Ins. Co*., 524 F. 2d 1317, 1319-20 (2d Cir. 1975).  It is well established that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 255.  Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs*., 22 F. 3d 1219, 1223 (2d Cir. 1994).

In an employment discrimination case where intent of the employer is at issue, the trial court must be especially cautious about granting summary judgment.  *Kerzer v. Kingley Mfg., supra* at p. 400.  Summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error. See *Danzer v. Norden Systems, Inc*., 151 F.3d 50, 54 (2d Cir. 1998); see also *Graham v. Long*

*Island R.R.*, 230 F.3d at 38.  ("Summary judgment is sparingly used where intent and state of mind are at issue...because, as we have emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination...").

When a court considers, in ruling on the defendant's motion for summary judgment, whether the evidence can support a verdict of discrimination, the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination.  If so, summary judgment must be denied.  See *Stern v. Trustees of Columbia University in City of New York*, supra at p. 312.  See also *Kerzer v. Kingley Mfg.*, supra at p. 401.  ("In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.")  (Internal citations and quotations omitted.)

   *b. Age Discrimination*

A plaintiff asserting an employment discrimination claim has the burden at the outset of presenting evidence sufficient to establish a *prima facie* case of discrimination.  *Cronin v. Aetna Life Insurance Co., supra* at p. 203; *Chambers v. TRM Copy Centers Corp.,* supra at p. 37.  The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimis*.  *Chambers v. TRM Copy*

*Centers Corp.,* supra at p. 37; *Cronin v. Aetna Life Insurance Co.,* supra at p. 203, 204; *Meiri v. Dacon*, 759 F.2d 989, 998, fn 10 (2d Cir. 1985).

Where a plaintiff alleges discriminatory treatment in violation of the Age Discrimination In Employment Act (ADEA), the court applies the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed. 2d 668 (1973).  See also *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 142 (2000)("Under the ADEA, it is 'unlawful for an employer...to fail or refuse to hire or discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because such individual's age.'  29 U.S.C. § 623(a)(1).  Where a plaintiff alleges disparate treatment, "liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.'  ...That is the plaintiff's age must have actually played a role in the [employer's decisionmaking] process and had a determinative influence on the outcome.'  Recognizing that 'the question facing triers of fact in discrimination cases is both sensitive and difficult,' and that '[t]here will seldom be 'eyewitness testimony as to the employer's mental processes'...the Courts of Appeals...have employed some variant framework articulated in *McDonnell Douglas* to analyze ADEA claims that are based principally on circumstantial evidence...")(Internal citations omitted).

Where a plaintiff alleges discriminatory treatment in violation of the ADEA, as amended, the court applies the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25, 36 L.Ed. 2d 668 (1973); *Reeves v. Sanderson Plumbing Products, Inc.*, supra.  Under this approach, the plaintiff must first establish, by a

preponderance of the evidence, a *prima facie* case of discrimination. The burden, which the *McDonnell Douglas* framework places on the plaintiff, is not onerous, See *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 187; 109 S.Ct. 2363, 2378 (1989); *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 202 (2dCir. 1995), and has been described as de minimis. See *Howley v. Town of Stratford*, 217 F.3d 141, (2d Cir. 2000).

"To establish a prima facie case of age discrimination under the ADEA, a claimant must demonstrate that: 1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under 'circumstances giving rise to an inference of discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 137-138 (2d Cir. 2003). In the present case, the defendant cannot seriously dispute that the plaintiff will succeed in establishing a prima facie case of age discrimination: (i) at the time of his employment with the defendant he was a member of the class protected by the ADEA ("individuals who are at least 40 years of age", 29 U.S.C. § 631(a)), (ii) he was otherwise qualified for the work he performed[2], (iii) ) he was subjected to an adverse employment decision, he was fired after eight years of employment, and (iv) he was replaced by employees who were less than 25 years of age. [3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817(1973); *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 142 (2000).

---

[2] In spite of the defendant's belated attempts at belittling the plaintiff's job performance, the record is conclusive that the plaintiff was a superior job performer.

[3] Since the plaintiff was replaced by someone younger, the fourth element of the McDonnell Douglas framework is satisfied. "The Defendant first disputes that the Plaintiff met her burden of presenting a prima facie case sufficient to oblige it to explain its adverse action. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). Specifically, the Defendant contends that the Plaintiff failed to meet the requirement of showing that adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).* This argument is unavailing. We have characterized the evidence necessary to satisfy this initial burden as "minimal" and "de minimis," see, e.g.,

Once a plaintiff has established a *prima facie* case of discrimination, the defendant has the burden of producing, through the introduction of admissible evidence, the reasons for its actions, which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *Chambers v. TRM Copy Centers Corp.,* supra at p. 38. If the defendant carries its burden of production, the plaintiff then must show that the defendant's articulated reason for its decision is in fact a pretext for discrimination. *Chambers v. TRM Copy Centers Corp.*, supra at p. 38. In order to defeat summary judgment after the defendant has satisfied its burden of production, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination. See *Stern v. Trustees of Columbia University in City of New York*, supra at p. 312. Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the *prima facie* case, without more. See <u>*Reeves v. Sanderson Plumbing Products,*</u> <u>*Inc.*</u>, supra; see also <u>C</u>*hambers v. TRM Copy Centers Corp.*, supra at p. 38. The plaintiff has the ultimate burden of persuasion to demonstrate that the challenged employment decision was the result of intentional discrimination. A Title VII plaintiff may not prevail by establishing only falsity, but must prove, in addition, that a motivating reason was discrimination. See *Bickerstaff*

---

*Byrnie v. Town of Cromwell,* 243 F.3d 93, 101 (2d Cir. 2001*); Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 467 (2d Cir. 2001)*, and the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage* of the Title VII analysis, see *Tarshis v. Riese Organization,* 211 F.3d 30, 36 (2d Cir. 2000); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1239 (2d Cir. 1995)*."  Zimmerman v. Assocs. First Capital Corp.,* 251 F.3d 376, 380 (2d Cir 2001).

*v. Vassar College*, 196 F.3d 435, 447 (2d Cir. 1999) ("Though there are sentences in some opinions to the effect that a Title VII plaintiff must prove both that the defendant's proffered reason was false, and that discrimination was the real reason, these decisions *do not* require a finding of falsity in addition to a finding of discrimination; they make the quite different point that a Title VII plaintiff may not prevail by establishing only falsity, but must prove, in addition, that a motivating reason was discrimination.") (Internal citations and quotations omitted.).

A trier of fact is able to find pretext because the reasons advanced by the defendant for firing the plaintiff are not worthy of credence.  At the time he was fired the plaintiff was informed by the defendant that it was discharging him as a result of the plaintiff having submitted the same phone bills for reimbursement on different occasions, one phone bill on three occasions and one phone bill on two occasions, in total, some $60.00.  However, just prior to the plaintiff's firing, the defendant's accounting department viewed the plaintiff's actions as "simply oversights", and nothing more, and requested that the plaintiff be more careful in the future. (Discovery Exhibit 36).  The assertion that the submission of the phone bills was sufficient justification for the plaintiff's termination is completely inconsistent with the position adopted by the defendant's accounting department.  The plaintiff can also "establish pretext by showing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'"  *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 56 (1st Cir. 2000) (Internal citations omitted.).  In light of the plaintiff's work record, the commendations he received, the initial view taken of the errors in his phone bill

22

submissions by the defendant's department in charge of overseeing expense reimbursement, a factfinder could find that it was implausible that the defendant fired the plaintiff for the reasons it originally asserted, the mistakes made by the plaintiff in submitting his phone bills for reimbursement.  See *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d  at  56 ("Based upon these weaknesses in the nondiscriminatory reasons Centennial provided, the jury could find that the reasons were pretextual").  "In other words, pretext is a lie, specifically a phony reason for some employment action by the employer...Pretext does not require that plausible facts presented by the defendant not be true, only that they not be the reason for the employment decision...Indeed, circumstantial evidence can be offered to prove that Defendant's purported reasons for the promotion decision are not worthy of belief and thus pretextual." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1045 (7th Cir. 2000) (Internal citations and quotations.).

Additionally, the defendant's communications to its employees regarding the system-wide[4] lack of adherence to its expense reporting procedures demonstrates the non-fraudulent nature of the plaintiff's reimbursement errors.  In 1999, a memo went out from the accounting department pleading with employees to follow procedures, "[p]lease take the time and do it right the first time any errors delay your reimbursement."  (Discovery Response Exhibit 2).  In February 2001, a policy statement was issued "to establish reasonable and consistent travel and entertainment expense standards for EDR employees".  And yet again, on May 5, 2002, another

---

[4] The plaintiff's discussions with Ali Dusault, another regional manager, show the problems that she was having with her expense reports.

policy document was prepared by the defendant, "Expense Report Policies", "in order to establish reasonable and consistent travel and entertainment expense standards for EDR employees". Further contradicting the defendant's characterization of the plaintiff's conduct is the fact that every so-called fraudulent expense report submitted by the plaintiff had the approval of the plaintiff's supervisor. In the very least, there are factual issues in dispute surrounding the issue of the appropriateness of the plaintiff seeking reimbursements for lunches he took at the end of the day. But what is not in dispute is the fact that the plaintiff's supervisor and the defendant's accounting department consistently, without exception, approved the plaintiff's expense report submissions over an eight year period of time. If the plaintiff could not submit his expenses for lunches he consumed at the end of the day, it was a "mistake" in the interpretation of the defendant's policy made by not only the plaintiff but by his supervisor and the defendant's accounting department as well. Over an eight-year period of time, from the date of his hire through the date of the plaintiff's termination, the plaintiff's supervisor and the defendant's accounting department never questioned the propriety of the plaintiff's submission of expense reports seeking reimbursement for lunches consumed at the end of the plaintiff's workday, and not necessarily during the traditional lunchtime hours. (Kern Tr. 55, 58, 72, 145).

Further proof of discrimination is found in the defendant's failure to document its reasons for firing the plaintiff. The termination letter sent to the plaintiff left the reason or reasons for his termination completely unstated, clearly leaving the defendant the leeway to alter the record to suit its purposes, implicitly acknowledging the insufficiency of the original explanation for firing the plaintiff. Other than what Barber told the plaintiff over the telephone when he fired the

plaintiff, the defendant did not explain why it had terminated the plaintiff. The defendant's records do not give any indication as to the reason it fired the plaintiff. In particular, the defendant cannot point to any contemporaneous written record that substantiates its claim that the plaintiff was discharged because he had "engaged in wide-ranging and repeated acts of expense reimbursement fraud".

The defendant advanced for the first time the claim that the plaintiff had "engaged in wide-ranging and repeated acts of expense reimbursement fraud" only after the plaintiff filed a complaint with the EEOC. (Discovery Exhibit 63). Prior to answering the EEOC, the defendant never asserted this reason as a basis for its action even though the defendant had ample opportunity and reason to advance such a claim. It could have asserted "wide-ranging and repeated acts of expense reimbursement fraud" in defense to the plaintiff's unemployment compensation claim. Similarly, the defendant could have addressed its charge directly in its correspondence it had with the plaintiff after his termination with regard to the plaintiff's claims that he was owed money by the defendant. It is most revealing that the defendant did not attempt to document its allegations of "wide-ranging and repeated acts of expense reimbursement fraud" prior to its response in the present case. Implicit in these late day claims is the defendant's recognition that its original excuse for terminating the plaintiff's employment was not sufficient to withstand the plaintiff's claim of age discrimination.

Likewise, pretext is found in the defendant's after-the-fact efforts to bolster its reasons for terminating the plaintiff's employment. "Another method of establishing pretext is to show that [defendant's] nondiscriminatory reasons were after-the-fact justifications, provided

subsequent to the beginning of legal action." *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d at 56.  See also *Walton v. Nalco Chem. Co.*, 272 F.3d 13, 23-24 (1st Cir. 2001) applying the after-the –fact analysis to reasons advanced for terminating an employee, which were advanced for the first time by the employer after it received a letter from the employee's attorney claiming age discrimination.  "Moreover, Walton adduced evidence that Nalco maneuvered to establish a pretextual basis for discharging him.  See *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (noting that pretext may be established with evidence that 'nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action').  After Nalco received a letter, from Walton's attorney, claiming age discrimination, Joseph Carney, Walton's direct supervisor, administered the so-called Personnel Regeneration Form to Walton at Yankowski's direction, which purported to show that Walton was not a competent salesman." *Walton v. Nalco Chem. Co.*, 272 F.3d at 23-24.  The defendant cannot point to any moment in time prior to the complaint of age discrimination being filed by the plaintiff when it advanced the claim that the plaintiff had "engaged in wide-ranging and repeated acts of expense reimbursement fraud".  It was only after it had been charged with age discrimination did it first assert this baseless claim.

Not only is the timing in advancing its charge of fraudulent behavior suspect, but the defendant's characterization of the plaintiff's behavior as fraud is similarly incredulous.  As discussed above, the plaintiff's behavior cannot be described as "wide-ranging and repeated acts of expense reimbursement fraud".  The plaintiff followed the defendant's policies; he did not falsify any records, he did not conceal any information, and his expense reports were approved in

their entirety by his supervisor and the defendant's accounting department.  In essence, the

plaintiff did not participate in any activity that could be described as fraudulent.

Although admittedly not sufficient in itself to prove pretext,[5] the defendant's claim made

to the EEOC that the plaintiff's performance was adequate at best, demonstrates the defendant's

overall mendacity adopted by the defendant in defense of the plaintiff's discrimination

complaint.  For no plausible reason, the defendant advanced this assertion in light of

overwhelming evidence of the plaintiff's superior job performance.  (See Discovery Response

Exhibit 6; Exhibit 7; Exhibit 8; Exhibit 9; Exhibit 10; Exhibit 13; Exhibit 14; Exhibit 16; Exhibit

17; Exhibit 18; Exhibit 19; Exhibit 20; Exhibit 21; Exhibit 22; Exhibit 23; Exhibit 24; Exhibit

26; Exhibit 27; Exhibit 28; Exhibit 29; Exhibit 37; Exhibit 38; Exhibit 39).

A showing that the defendant's stated reason is not the true reason for its action is probative of

unlawful discrimination.  See *Reeves v. Sanderson Plumbing Products, Inc.*, supra ("Proof that the

defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is

probative of intentional discrimination, and it may be quite persuasive...In appropriate circumstances,

the trier of fact can reasonably infer from the falsity of the explanation that the employer is

dissembling to cover up a discriminatory purpose ... Moreover, once the employer's justification has

been eliminated, discrimination may well be the most likely alternative explanation, especially since

the employer is in the best position to put forth the actual reason for its decision...Thus a plaintiff's

prima facie case, combined with sufficient evidence to find that the employer's asserted justification

---

[5] Since the defendant does not claim the plaintiff's termination was the result of performance-based issues,
contradicting the defendant's assertion that the plaintiff's work was adequate at best would not alone prove pretext.
However, proof of the falsity of the defendant's assertion regarding the plaintiff's work performance would support
an overall finding of pretext.

is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated.")(Internal quotations and citations omitted).  See also *Bickerstaff v. Vassar College*,

196 F.3d 435, 447(2d Cir. 1999).  Because a reasonable fact finder could conclude that defendant's

stated reason was a pretext for unlawful discrimination, summary judgment should not be granted to

the defendant on the plaintiff's age discrimination claim.  *Terry v. Ashcroft*, 336 F.3d 128, 140 (2nd

Cir. 2003).

> *c. Unlawful Retaliation*

"The antiretaliation provision of the Age Discrimination in Employment Act (ADEA), 29

U.S.C. § 621-634, prohibits an employer from discriminating 'against any of his employees or

applicants for employment' who have opposed practices made unlawful by the ADEA, 29 U.S.C. §

623(d), with 'employee' defined as 'an individual employed by any employer.'  29 U.S.C. § 630(f).

Courts have interpreted this definition of 'employee' to include former employees who suffer post-

employment retaliatory conduct.

E.g. *Passer v. Am. Chem. Soc'y*, 290 U.S. App. D.C. 156, 935 F.2d 322, 330 (D.C. Cir. 1991)

(holding that a former employee who alleged post-employment retaliation was still an 'employee' and

remained protected by the ADEA); *EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1088 (5th Cir. 1987)

(stating that under the ADEA antiretaliation provision, 'the term 'employee' . . . is interpreted broadly:

it includes a former employee as long as the alleged discrimination is related to or arises out of the

employment relationship').  *Smith v. BellSouth Telecomms*., *Inc.,* 273 F.3d 1303, 1309-1310 (11th

Cir. 2001).  The plaintiff, when filing a claim of age discrimination against the defendant with the

EEOC, is protected from retaliation pursuant to the anti-retaliation provisions of the ADEA.  It is of

no moment that the retaliatory act directed against the plaintiff, filing of legal claims against the plaintiff alleging fraudulent conduct, occurred after the plaintiff had been fired; coverage under the ADEA extends to former employees, such as the plaintiff.

To establish a prima facie case for retaliation under ADEA, a plaintiff must show that (1) the employee was engaged in protected activity by opposing a practice made unlawful by ADEA; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Holtz v. Rockefeller & Co. 258 F.3d at 79 (2d Cir. 2001); Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996). It cannot seriously be disputed that the plaintiff satisfies the necessary elements for proving a prima facie case of unlawful retaliation. As to the first element, in filing a complaint of age discrimination with the EEOC, the plaintiff was engaged in the most fundamental activity protected by the ADEA. As to the second element, the defendant cannot dispute that it was aware of the plaintiff's activity; it answered the plaintiff's complaint. With regard to the third element, the filing by the defendant of its counterclaim in the present action, asserting various causes of action against the plaintiff, constitutes an adverse employment action. [T]he adverse action requirement for a retaliation claim encompasses an allegedly bad faith counterclaim brought by the employer against its former employee. *Gill v. Rinker Materials Corp.*, 2003 U.S. Dist. LEXIS 2986 (E.D.Tenn. February 24, 2003). See also, *EEOC v. Outback Steakhouse, Inc.*, 75 F. Supp. 2d 756, 759 (N.D. Oh. 1999) ("A number of other courts have also found that 'the filing of lawsuits, not in good faith and instead motivated by retaliation, can be the basis for a claim under Title VII.' *Harmar*

*v. United Airlines, Inc.* 1996 U.S. Dist. LEXIS 5346, 1996 WL 199734 (N.D. Ill.).  In *EEOC v. Virginia Carolina Veneer Corp.* 495 F. Supp. 775, 778 (W.D. Va. 1980), for instance, the court found that the filing of a state court defamation action was 'unquestionably retaliatory' under Title VII.  See also   1999 U.S. Dist. LEXIS 932, 1997 WL 312048 (N.D. Ill.).  In addition, courts have found retaliatory litigation under the Age Discrimination in Employment Act ("ADEA") and noted the similarity between the ADEA and Title VII.  In *Passer v. American Chemical Society,* 290 U.S. App. D.C. 156, 935 F.2d 322 (D.C. Cir. 1991), although the conduct complained of was still employment-related, the court ruled that under the ADEA the employer need only have 'engaged in conduct having an adverse impact on the plaintiff.'  935 F.2d at 331. In *Blistein v. St. John's College*, a district court found that retaliatory action under the ADEA need not be employment-related and could include the filing of a counterclaim.  860 F. Supp. 256, 267-268 (D. Md. 1994).

        And, the fourth element is satisfied by the close temporal proximity between the protected activity and the retaliatory act.  Viewing the chronology of events culminating in the defendant's counterclaim, the defendant did not file a claim against the plaintiff charging him with widespread fraudulent behavior until the plaintiff filed his claim in this court alleging age discrimination; the defendant did not even threaten such action.  In correspondence to the plaintiff, the defendant's entire focus was on the telephone bills, not the supposed widespread fraud it had uncovered prior to firing the plaintiff.  In a letter to the plaintiff dated August 9, 2002, well after the defendant allegedly had discovered the widespread fraud regarding the plaintiff's meal reimbursements, the defendant only mentioned that "EDR will counterclaim for

all amounts owed to EDR *as a result of expense reports you submitted in duplicate*[6]".

(Discovery Response Exhibit 44).  It never asserted any claim that the plaintiff had committed

widespread fraud in his requests for meal reimbursements[7], until he commenced age

discrimination proceedings against the defendant.  The August 6, 2002 letter, itself, discloses the

retaliatory motive of the defendant.  It asserts that if the plaintiff sues for age discrimination, it

will file a counterclaim against the plaintiff for the duplicate submissions.  Inherent in the threat

is the clear message, if the plaintiff does not sue the defendant for age discrimination, the

defendant will overlook the duplicate charges.

It was immediately after the plaintiff filed this lawsuit that the defendant asserted its

spurious causes of action against the plaintiff.  As previously noted, the defendant had never

threatened to sue the plaintiff for unjust enrichment, fraud, conversion, tortious interference with

business relations and tortious interference with contract until the plaintiff commenced the

present litigation.  And a review of the assertions contained in the counterclaim reveals their

frivolous character.  "A plaintiff may prove that retaliation was a 'substantial' or 'motivating'

factor behind an adverse employment action either (1) indirectly, by showing that the protected

activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2)

directly, through evidence of retaliatory animus directed against the plaintiff by defendant...

Under some circumstances, retaliatory intent may also be shown, in conjunction with the

---

[6] The two phone bills totaled an amount of $62.17, hardly evidence of widespread fraud.

[7] There is no claim that the plaintiff submitted his requests for meal reimbursements in duplicate.  The facts
demonstrate that the plaintiff submitted his meal reimbursement request in compliance with the process established
by the defendant.  There is no indication that the plaintiff submitted any of these requests in duplicate.

plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination." *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)(Internal quotations and citations omitted).

The proof establishing the plaintiff's prima facie case, together with the evidence regarding the baseless allegations advanced by the defendant in support of its causes of action is sufficient to allow a trier of fact to find for the plaintiff on his retaliation claim. As discussed with regard to the plaintiff's age discrimination cause of action, the defendant has no basis to charge the plaintiff with fraud. The mistaken submission of two phone bills for reimbursement, one bill on two occasions, and the other on three occasions, both bills totaling $62.17 just does not support a claim of fraud. The defendant's accounting department reaction to the errors, labeling them as oversights, further demonstrates defendant's pretext. As to the plaintiff's request for meal reimbursements, the plaintiff did nothing that could be considered fraudulent; he submitted accurate records of the meals, the reimbursement for which he received the approval of his supervisor and the defendant's accounting department.

The spurious nature of the fraud claim carries over to the defendant's allegations regarding conversion, tortious interference with business relations and tortious interference with contract. The causes of action were instituted to punish the plaintiff for suing the defendant for age discrimination. As such, summary judgment is inappropriate on the plaintiff's retaliation claim. See *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998).

*d. Violation of Connecticut General Statutes § 31-71c and § 31-76k*[8]

---

[8] In his substituted complaint the plaintiff mislabeled the statutes in the caption of his First Cause of Action.

There is no dispute that the defendant operates its national network out of Southport, Connecticut.  It, therefore comes within the coverage of Connecticut General Statutes § 31-71(c) and § 31-71k.  Connecticut General Statutes § 31-71a (1) defines employer as including "any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of a deceased person, the conservator of the estate of an incompetent, or the receiver, trustee, successor or assignee of any of the same, employing any person, including the state and any political subdivision thereof".  Clearly, the defendant falls within this definition.  Similarly, employee is defined by § 31-71a (2) to include "any person suffered or permitted to work by an employer".  The plaintiff, without question, is an employee within the meaning given the term employee by this particular statute.  Since the defendant directs its national operations from the state of Connecticut, and since it has its headquarters in Connecticut, there is no jurisdictional basis to support the defendant's assertion that the Connecticut Wage and Hour Laws do not apply to the defendant's failure to pay the plaintiff.  Also, there is nothing in the relevant statutory provisions excluding employees assigned to out-of-state territories by their Connecticut employer from the protections of Connecticut's Wage and Hour Laws.

What is not in dispute is the defendant's liability to the plaintiff for payment of accrued vacation and sick time.  What is in dispute is the amount owing the plaintiff.  The determination of this issue involves a factual determination regarding the particulars of the defendant's policy concerning payment of accrued vacation and sick time.  The plaintiff has asserted that it has always been the defendant's policy that vacation and sick time accrue in full at the start of the

new year, and does not accumulate proportionally over time.  Additionally, the plaintiff disputes

the amount of vacation time the defendant claims the plaintiff had used before he was

terminated.  With these material factual issues in dispute, summary judgment on the plaintiff's

claim is unwarranted.

> e. *Breach of Contract for Payment of Wages*

Assuming that the plaintiff is not covered by the Connecticut Wage and Hour Laws, the

plaintiff makes out a claim for breach of his employment agreement under Florida law.  Under

Florida  law an employee who has not been paid wages by his employer is entitled to bring an

action for breach of contract to recover the employee's wages.  "Florida courts have addressed

several types of compensation other than salary and found them to be 'unpaid wages' within the

meaning of the statute [*Fla. Stat. § 448.08*].  See, e.g., *Warshall v. Price*, 629 So. 2d 905 (Fla.

4th DCA 1993 ); *Strasser v. City of Jacksonville*, 655 So. 2d 234 (Fla. 1st DCA 1995 )(annual

leave credits and vacation pay); *D.G.D., Inc. v. Berkowitz*, 605 So. 2d 496 (Fla. 3d DCA 1992

)(unpaid commissions); *Woods v. United Indus. Corp*., 596 So. 2d 801 (Fla. 1st DCA 1992

)(severance pay); *Ivens Corp. v. Cohen*, 593 So. 2d 529 (Fla. 3d DCA 1992 ) (employee

bonuses)."  *Speer v. Mason*, 769 So. 2d 1102, 1104 (Fla. App. 2000).  Factual disputes

predominate over the amount of wages and benefits owed the plaintiff, and thus, summary

judgment is not appropriate.

> f. *Tortious Interference with Business Opportunity*

 "It is well established that the elements of a claim for tortious interference with business

expectancies are: (1) a business relationship between the plaintiff and another party; (2) the

defendant's intentional interference with the business relationship while knowing of the

relationship; and (3) as a result of the interference, the plaintiff suffers actual loss.  *Solomon v.*

*Aberman,* 196 Conn. 359, 364, 493 A.2d 193 (1985); *Herman v. Endriss*, 187 Conn. 374, 377,

446 A.2d 9 (1982); *Harry A. Finman & Son, Inc. v. Connecticut Truck & Trailer Service Co*.,

169 Conn. 407, 415, 363 A.2d 86 (1975*).*"  *Hi-Ho Tower, Inc. v. Com-Tronics, Inc*., 255 Conn.

20, 27 (2000).  The plaintiff has submitted sufficient proof to justify a trier of fact to conclude

that the defendant tortiously interfered with his business expectancies vis-à-vis FirstSearch.  The

events involving the defendant's intrusion into the plaintiff's relationship with FirstSearch

establish the defendant's liability for tortious interference.  The plaintiff formed a company

called Environmental Reports, Inc. to pursue income-producing endeavors in the environmental

data business.  The plaintiff executed an "Independent Contractor Agreement" with  FirstSearch

Technology Corporation on November 1, 2002.  Under the agreement, the plaintiff assented to

"represent and provide Company's services to Company's national clients".  Because of the non-

compete agreement, which the plaintiff was made to sign in 2000 with the defendant, the

plaintiff voluntarily excluded FirstSearch's Florida clients from the purview of his sales efforts.

(Kern Tr. 102, 103)

      Despite excluding the Florida territory from his services for FirstSearch, the defendant

insisted on the enforcement of the non-compete agreement over its full national scope.  In

simultaneous letters sent to the plaintiff and FirstSearch on November 25, 2002, the defendant

threatened litigation to enforce the terms of the non-compete agreement.  (Discovery Response

Exhibit 50 and Exhibit 51)  In the letter to the plaintiff the defendant warned the plaintiff "[w]e

would consider any employment with First Search Technology ("First Search") to be a breach of

your Non-Compete/Confidentiality Agreement..." (Discovery Response Exhibit 51). Likewise,

the defendant informed the FirstSearch by email dated December 4, 2002, "Mr. Kern's efforts to

sell or 'promote' the Environmental FirstSearch product is in direct violation of his Agreement."

(Discovery Response Exhibit 54). On January 13, 2003, FirstSearch terminated the Independent

Contractor Agreement into which it had entered with the plaintiff, "please use this letter as

official notification that we are terminating this agreement..." (Discovery Response Exhibit 55).

Without doubt a trier of fact could determine that the termination of the business relationship

which the plaintiff had carved out with FirstSearch was the result of the intrusion of the

defendant. The timing of the contract termination coming on the heels of the threats overtly

made by the defendant amply demonstrates a causal connection between the defendant's conduct

and the termination of the business relationship between the plaintiff and FirstSearch.

### g. Non-Compete Covenant

In its memorandum in support of its motion for summary judgment, the defendant

confuses the two non-compete agreements the plaintiff was made to sign in order to work for the

defendant. The defendant refers to its Tab 4 as the 2000 agreement. However, Tab 4 is the 1994

agreement, while Tab 6 contains the 2000 agreement. The confusion is significant. The 2000

agreement, which by its express terms supersedes any previous agreement, does not permit the

plaintiff to act as a consultant or in any other capacity in the environmental data field throughout

the United States and for a period of one year. The defendant's claim that the 2000 agreement

"permitted any and all kinds of environmental consulting" is simply not true. The language to

36

which the defendant refers is contained in the 1994 agreement and not the 2000 agreement.  The 1994 agreement allowed the "employee [to] participate in any business engaged in environmental consulting".  The 2000 agreement omitted this language and replaced it with language barring such activity on the plaintiff's part, "Employee...shall not...consult with...with any proprietorship, firm, corporation, partnership, joint venture or other entity..."  (Discovery Response Exhibit 4).

Likewise, the defendant's contention that if the court finds the 2000 agreement invalid, then the 1994 agreement remains enforceable, flies in thee face of the specific language of the 2000 agreement, which states, "The Agreements constitute the entire agreement and understanding of the parties with respect to the subject matter thereof, and supersede any previous understandings or agreements, whether oral or written, express or implied."  (Discovery Response Exhibit 4).

"The five factors to be considered in evaluating the reasonableness of a restrictive covenant ancillary to an employment agreement are (1) the length of time the restriction operates; (2) the geographic area covered; (3) the fairness of the protection accorded to the employer; (4) the extent of the restraint on the employee's opportunity to pursue his occupation; and (5) the extent of interference with the public's interests."  *Robert S. Weiss & Assoc. v. Wiederlight,* 208 Conn. 525, 529, 546 A.2d 216 (1988).  The 2000 agreement most certainly fails the reasonableness factors.  The non-compete agreement contains a one-year non-compete provision and a one-year non-solicitation provision.  Thus, the agreements contain both an anti-sales covenant and an anti-solicitation covenant.  *Cost Management Incentives, Inc. v. Yollanda*

37

*London-Osborne et al.,* CV020463081, Superior Court Of Connecticut, Judicial District Of New

Haven, at New Haven, 2002 Conn. Super. LEXIS 3967 (copy attached). "It is basic that a

covenant restricting the covenantor from engaging in a competing enterprise is one in restraint of

trade and therefore is against public policy if the restraint is unreasonable. It is not valid unless it

is ancillary either to a contract for the transfer of good will or other subject of property or to an

existing employment or contract of employment. Restatement, 2 Contracts 515(e); 17 C.J.S.

629." *Domurat v. Mazzaccoli*, 138 Conn. 327, 330, 84 A.2d 271 (1951)." *Ibid.* "A covenant

restricting the activities of an employee after the termination of his employment in order to be

valid and enforceable must be partial or restrictive in its operation in respect either to time or

place, must be on some good consideration, and must be reasonable -- that is, it should afford

only a fair protection to the interest of the party in whose favor it is made and must not be so

large in its operation as to interfere with the interests of the public..." *Torrington Creamery, Inc.*

*v. Davenport*, 126 Conn. 515, 519 (1940) "The interests of the employee himself must also be

protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded

from pursuing his occupation and thus prevented from supporting himself and his family." *Scott*

*v. General Iron & Welding Co*., 171 Conn. 132, 137 (1976).

While employed by the defendant, the plaintiff worked first as the defendant's

Southeastern Regional Manager, and, in 2000 was appointed the defendant's Regional Manager

for Florida. In view of the geographic area assigned the plaintiff when he worked for the

defendant, the national scope of the restrictive covenant is unreasonable. To bar the plaintiff

from all employment opportunities in the environmental data field throughout the United States

is unfair, especially since the plaintiff's advantage in competing with the defendant would be limited to the state of Florida. "The covenant's language is so overly broad it provides more protection than plaintiff needs." *Cost Management Incentives, Inc. v. Yollanda London-Osborne et al.*, supra.

Additionally, the agreement is invalid because it lacks adequate consideration. The plaintiff was employed by the defendant when he was made to sign the agreement. "It is well settled law in Connecticut that continued employment is not consideration for a covenant not to compete entered into after the beginning of the employment." *Cost Management Incentives, Inc. v. Yollanda London-Osborne et al.*, supra. In fact, the plaintiff's salary was decreased when he accepted the position of Regional Manager for Florida. (Kern Tr. 40-44).

Based on the foregoing, the covenant fails to satisfy, in the least, three of the elements for judging the reasonableness of a non-compete agreement. The geographic area is overbroad; the protection accorded the employer is unfair; and the restraint on the employee's opportunity to pursue his occupation is unwarranted. Summary judgment is, thus, not proper on this cause of action.

THE PLAINTIFF – CHARLES KERN


BY_____
Thomas W. Bucci, for
WILLINGER, WILLINGER & BUCCI, P.C.
855 Main Street
Bridgeport, CT  06604
Tel: (203) 366-3939
Fax: (203) 337-4588
Fed. Bar #ct07805

**CERTIFICATION**

I hereby certify that copies of the foregoing *Memorandum in Opposition to Defendant's Motion for Summary Judgment* have been sent, by First Class Mail, postage prepaid, on this 21st day of January, 2004, to:


Brian D. Buckstein, Esq.
Fed. Bar #ct24543
Mark E. Zelek, Esq.
Fed. Bar #25202
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard
Miami, FL 33131-2339
Tel: (305) 415-3380
Fax: (305) 415-3001

Sarah Poston, Esq. For
Fed. Bar #17902
ZELDES, NEEDLE & COOPER, P.C.
1000 Lafayette Blvd
P.O. Box 1740
Bridgeport, CT 06601-1740
Tel: (203) 333-9441


_____
Thomas W. Bucci